# IN THE SUPREME COURT OF IOWA

No. 20–1150

Submitted September 30, 2022—Filed March 31, 2023

**STATE OF IOWA,**

Appellee,

vs.

**JERRY LYNN BURNS,**

Appellant.

Appeal from the Iowa District Court for Linn County, Fae Hoover Grinde, Judge.

Jerry Lynn Burns appeals his conviction of first-degree murder. **AFFIRMED.**

May, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, and McDonald, JJ., joined. McDonald, J., filed a concurring opinion. Oxley, J., filed a dissenting opinion. McDermott, J., filed a dissenting opinion, in which Oxley, J., joined except as to part I.B.

Nicholas Curran (argued) and Kathleen T. Zellner of Kathleen T. Zellner & Associates, PC, Downers Grove, Illinois, and Elizabeth A. Araguás of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids, for appellant.

Brenna Bird, Attorney General, and Tyler J. Buller (argued) (until withdrawal) and Bridget Chambers, Assistant Attorneys General, for appellee.

Nathan Freed Wessler (argued), Vera Eidelman, and Patrick Toomey of American Civil Liberties Union Foundation, New York, New York, for amicus curiae American Civil Liberties Union.

Rita Bettis Austen of ACLU of Iowa Foundation Inc., Des Moines, for amicus curiae ACLU of Iowa Foundation, Inc.

Jennifer Lynch of Electronic Frontier Foundation, San Francisco, California, for amicus curiae Electronic Frontier Foundation.

**MAY, Justice.**

Someone murdered Michelle Martinko on the night of December 19, 1979. Cedar Rapids police found Martinko's body in her car. Police collected what evidence they could, including her bloodstained dress. But police could not find Martinko's killer.

Decades passed. Technology developed. Police used advances in DNA technology and forensic genealogy to pursue the killer.

By 2018, police determined that DNA found on Martinko's dress would very likely match the DNA of one of three brothers: Donald, Kenneth, or Jerry Burns. All three brothers had grown up in Manchester, about an hour from Cedar Rapids. All three were living in Iowa in 2018.

Police watched the brothers. The plan was to collect discarded items that might carry samples of the men's DNA. Police collected a drinking straw that Kenneth discarded at a golf course clubhouse. And police collected a toothbrush from Donald's garbage. Lab analysis of these items showed that neither man's DNA could match the DNA found on Martinko's dress.

The third brother was Jerry Lynn Burns (Burns), the defendant in this case. Investigators saw Burns eating at a Pizza Ranch in Manchester. Burns was drinking soda through a clear plastic straw. When Burns finished eating, he got up and walked out of the restaurant. Burns left the drinking straw behind. Police retrieved the straw. A lab analyzed DNA on the straw. The lab report said that the "DNA donor could NOT be eliminated as the major contributor to the DNA profile previously developed" from Martinko's dress.

So then police obtained a warrant to swab Burns's mouth directly. Laboratory analysis then confirmed that Burns's DNA profile matched DNA found on Martinko's dress. According to the lab, the probability of finding the same DNA profile in a population of unrelated individuals would be "less than 1 out of 100 billion."

Armed with this and other evidence, the State charged Burns with murder in the first degree. A jury found Burns guilty.

On appeal, Burns argues that police violated his constitutional rights by failing to secure a warrant before analyzing the DNA on the straw that he left at the Pizza Ranch. Burns also argues that the court erred by failing to give a requested jury instruction. Finally, Burns claims that there was insufficient evidence to support the jury's guilty verdict. We affirm.

**I. Background Facts and Proceedings.**

In December 1979, Martinko was an eighteen-year-old senior at Kennedy High School in Cedar Rapids, Iowa. On December 19, Martinko and classmates attended a choir banquet at the Sheraton Hotel. Martinko was wearing a black dress.

Among her classmates, Martinko was well-known for driving a large 1972 Buick. After the banquet, Martinko drove the Buick to Cedar Rapids's recently-opened Westdale Mall. While there, Martinko spoke to several friends. Sometime between 9 p.m. and 10 p.m., she left the mall alone and headed out to the parking lot. Around 10:30–11:00 p.m., the assistant manager at a Pier 1 Imports saw Martinko's Buick in the parking lot. The assistant manager described the

car as "just kind of out there by itself." It seemed "out of place" for that time of night.

Shortly after 4 a.m., Cedar Rapids police were dispatched to look for the Buick. Police found it in the mall parking lot. Inside the Buick, police found Martinko's body. She was fully clothed and covered with blood. There were visible stab wounds to her chest. Her autopsy would reveal that she had suffered a total of twenty-nine sharp-edge wounds, including defensive wounds on her hands. The doctor concluded that "there was a struggle" that led to her death. "Her heart was still pumping" when the murderer inflicted the fatal stab "deep into [her] aorta," a "major . . . blood-carrying organ of the body." The doctor also thought that the killer could have cut themself during the assault.

Police collected Martinko's bloodstained dress. Otherwise, though, the crime scene was basically limited to the Buick and surrounding area. Police did not find any of the murderer's fingerprints. Instead, inside the car, police found "chevron-type" glove prints of the kind made by commonly available rubber gloves. Police found these prints on "the operating parts of the car -- the shift lever, the steering wheel, the door handles, . . . the keys, [and the] light switch." From this, police inferred that the rubber-glove-clad murderer had driven the Buick after the assault. Police collected blood from the Buick's steering wheel and gearshift lever.

Time passed, but no viable suspect emerged. Beginning in the late 1990s, though, law enforcement began conducting DNA analysis on the evidence that they had collected. Initial testing could only detect (1) Martinko's DNA on the

dress and (2) the DNA of more than one indeterminate persons on the gearshift lever.

Over time, DNA technology improved. In 2002 and 2003, testing of the dress allowed the development of a full DNA profile for Martinko. And testing of the gearshift lever sample yielded a mixed profile that included "[a]t least one male and one female" contributor.

In 2005, the Iowa Division of Criminal Investigations (DCI) lab tested additional bloodstain locations on Martinko's dress. One of those locations— referred to as "stain #5" or "#F5"—yielded a partial male profile. The lab noted that "[f]ewer than one in one hundred billion unrelated individuals would" match the profile discovered at stain #F5. The lab also determined that the male contributor to stain #F5 "could also be the donor of the minor male contribution" found in the gearshift lever sample.

So police focused their efforts on finding the male contributor to stain #F5. Police submitted the #F5 profile to the FBI's CODIS[1] database, which consists of millions of known DNA profiles. No matches were found.

Police also compiled a list of potential suspects from police reports and other sources. More than 100 individuals were cleared from suspicion by collecting their DNA through buccal swabs and then comparing their DNA profiles against the #F5 profile. Other possible suspects were cleared on other grounds, such as being in custody at the time of the murder.

---

[1]CODIS refers to Combined DNA Index System.

In 2018, police used the services of a private lab called Parabon to perform kinship analysis and genetic genealogy. This work included running the #F5 profile through a public database called GEDmatch. Based on this analysis, Parabon directed police to investigate the descendants of four sets of great-great-grandparents. Police did so.

As part of this work, police contacted Janice Burns of Linn County, Iowa. Janice agreed to provide her DNA through a buccal swab. Parabon was then able to report that the contributor of the #F5 profile was probably a first cousin of Janice Burns. Janice has three first cousins: defendant Burns and his two brothers Donald and Kenneth.

Police then began surveilling the three brothers. The plan was to collect discarded items that could contain the men's DNA. Police collected a straw from Kenneth and a toothbrush from Donald's trash. Lab analysis of these items eliminated Donald and Kenneth as possible contributors to stain #F5.

Police followed Jerry Burns and his son to a Pizza Ranch in Manchester. Investigators sat down in the booth next to Burns. They saw Burns drink several sodas using a clear drinking straw. When Burns and his son finished eating, they got up and walked out of the restaurant.[2] Police then grabbed Burns's soda cup, packaged up the straw, and sent it to the DCI lab for analysis. The lab extracted DNA from the straw, analyzed it, and created a report. The report said:

> The weak DNA profile developed from the ends of the straw indicated a male source. The DNA donor could NOT be eliminated as the major

---

[2]At Pizza Ranch, you pay before you eat.

contributor to the DNA profile previously developed from stain #F5 . . . from the black dress . . . .

Further interpretation may be attempted if a KNOWN DNA sample from a potential source is submitted.

In light of this report, police sought and obtained a search warrant to swab Burns's mouth directly. The DCI lab then confirmed that Burns's DNA profile matched the stain #F5 profile. The report went on to say: "The probability of finding this profile in a population of unrelated individuals, chosen at random, would be less than 1 out of 100 billion." And a private lab—Bode Technology— found that Burns's DNA was consistent with DNA extracted from the gearshift lever in Martinko's Buick. One in 1,700 males would match the DNA profile from the gearshift lever sample. This match was close enough to eliminate about 99.94% of all males in the United States.

Police interviewed Burns at his office in Manchester. Burns denied any firsthand knowledge of the murder. When police confronted Burns, he repeatedly told police to "test the DNA."

On January 24, 2019, police charged Burns with murder in the first degree. Prior to trial, Burns filed a motion to suppress. Burns argued that the warrantless search of his DNA from the Pizza Ranch straw violated the Fourth Amendment to the United States Constitution as well as article I, section 8 of the Iowa Constitution. The court disagreed. The court believed that a person does not maintain a reasonable expectation of privacy in property that has been abandoned. And "[w]hen he exited the restaurant without the straw," the court

believed, Burns "relinquished any expectation of privacy in the drinking straw, the saliva left on it and the DNA contained within the saliva."

The case went to trial. Among other evidence, the jury heard the testimony of Michael Allison, a federal detainee. When Burns was in jail awaiting trial, he bunked near Allison. At Burns's trial, Allison testified about incriminating statements that Burns had made. According to Allison, Burns said that "he wished he had listened to his dad and cleaned up after himself" but that "no one was thinking about DNA as far as it being a possibility" in 1979. Burns also threatened to take Allison "to the mall" after Allison beat him in a game of cards. And Burns told Allison that "[h]e feels like no matter what happens in this case, that he wins, because he had the opportunity to be out there with his family all these years." Plus, Burns autographed a news story about the murder for Allison. Burns wrote, "[T]o my favorite son Michael" and signed it "Jerry Burns."

A jury found Burns guilty of murder in the first degree. The court sentenced Burns to prison. Burns now appeals.

**II. Analysis.**

**A. Did Police Need a Warrant to Collect the Straw that Burns Discarded or to Analyze DNA Attached to the Straw?** Burns contends that the district court should have suppressed evidence about the DNA that police found on the straw that Burns discarded at the Pizza Ranch. He argues suppression was required by the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Following our de novo review, we conclude that the district court was right to deny suppression.

*See State v. Brown*, 930 N.W.2d 840, 844 (Iowa 2019) ("When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." (quoting *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017))).

1. *General principles.* The United States Constitution is a written document. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–78 (1803). So is the Iowa Constitution. *See Stewart v. Bd. of Supervisors*, 30 Iowa 9, 18–19 (1870). They both consist of words.

Here are the words of the Fourth Amendment to the United States Constitution side-by-side with the words of article I, section 8 of the Iowa Constitution:

| **Fourth Amendment to the United States Constitution** | **Article I, section 8 of the Iowa Constitution** |
| --- | --- |
| The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. | The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized. |

Comparison shows that the words of the Fourth Amendment are essentially identical to the words of section 8. *See State ex rel. Kuble v. Bisignano*, 28 N.W.2d 504, 508 (Iowa 1947). And we have recognized that section 8 "as originally understood, was meant to provide the same protections as the Fourth Amendment, as originally understood." *State v. Wright*, 961 N.W.2d 396, 411–12 (Iowa 2021).

It is perhaps unsurprising, then, that this court's interpretations of section 8 have often "tracked with prevailing federal interpretations" of the Fourth Amendment. *Kain v. State*, 378 N.W.2d 900, 902 (Iowa 1985). But we are not "compel[led]" to follow that path. *Bisignano*, 28 N.W.2d at 508 (noting that, although section 8 "is identical in language with the Fourth Amendment," this "does not compel us to follow the construction placed on the language by the United States Supreme Court"). While the United States Supreme Court is the final arbiter of the *Federal* Constitution's meaning, the same is not true of the *Iowa* Constitution. *McClure v. Owen*, 26 Iowa 243, 248–50 (1868) (noting the United States Supreme Court "is required to look to the courts of the States for the rules of construction of their respective laws and Constitutions"). Rather, the Iowa Supreme Court "is the final arbiter" of what the Iowa Constitution means. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law."). And we recognize our "duty to interpret" the Iowa Constitution "independently." *Brown*, 930 N.W.2d at 847. Indeed, "[w]e jealously guard our right to construe a provision of our state constitution differently than its federal counterpart." *Id.* (quoting *State v. Brooks*, 888 N.W.2d 406, 410–11 (Iowa 2016)). We also recognize our duty to "interpret our constitution consistent with the text given to us by our founders," *State v. Green*, 896 N.W.2d 770, 778 (Iowa 2017), and to "give the words used by the framers their natural and commonly-understood meaning" in light of the "circumstances at the time of adoption," *State v. Senn*, 882 N.W.2d 1, 8 (Iowa 2016) (quoting *Star Equip., Ltd. v. State*, 843 N.W.2d 446, 457–58 (Iowa 2014)).

It follows that if a federal interpretation of the Fourth Amendment is not consistent with the text and history of section 8, we may conclude that the federal interpretation should not govern our interpretation of section 8.

With this background in mind, we turn to Burns's arguments about the Fourth Amendment and section 8. He addresses the two provisions separately. We follow his lead.

2. *Fourth Amendment analysis.* According to its text, the Fourth Amendment protects "the people" from "unreasonable searches and seizures" of "their persons, houses, papers, and effects." U.S. Const. amend. IV. It would seem, then, that the Fourth Amendment could apply if the discarded straw—or the DNA attached to it—were part of Burns's "person," Burns's "house," Burns's "papers," or Burns's "effects." *Cf. Hester v. United States*, 265 U.S. 57, 59 (1924) ("[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields.").

Burns's brief recites the words of the Fourth Amendment. But his brief does not argue that the straw or the DNA would qualify as his "person," his "house," his "papers," or his "effects" for purposes of the Fourth Amendment.[3]

Instead, Burns relies on cases that extend Fourth Amendment protections beyond those "places and things" that are "indicate[d] with some precision" in the Fourth Amendment's text. *Oliver v. United States*, 466 U.S. 170, 176 (1984)

---

[3]At oral argument, Burns and the amicus's counsel suggested that Burns's straw-attached DNA might qualify as a "person." We generally decline to "decide or consider arguments raised for the first time during oral argument." *State v. Warren*, 955 N.W.2d 848, 860 (Iowa 2021). In any event, the parties have not cited—and we have not found—authority for the proposition that discarded DNA counts as a Fourth Amendment "person."

(citing *Hester*, 265 U.S. at 59). These cases tie Fourth Amendment protections to "reasonable expectation[s] of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *see Kyllo v. United States*, 533 U.S. 27, 33 (2001) (noting that, under modern jurisprudence "a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless" the reasonable expectation of privacy test is met). Under these cases, a reasonable expectation of privacy exists if two criteria are met. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) ("This inquiry . . . normally embraces two discrete questions."). First, the defendant must have sought to "preserve something as private." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Smith*, 442 U.S. at 740). Second, the defendant's expectation of privacy must be "one that society is prepared to recognize as reasonable." *Id.* (quoting *Smith*, 442 U.S. at 740); *see also Skinner v. Ry. Lab. Execs.'*, 489 U.S. 602, 616–17 (1989) (analyzing whether society had recognized certain expectations of privacy). Unless both criteria are met, there is no reasonable expectation of privacy, and the Fourth Amendment does not apply.

These criteria are not met here. Burns made no effort to "preserve" the straw "as private." He left it on the table at a Pizza Ranch. It was open to collection by Pizza Ranch employees or fellow diners—whether those diners were civilians or, as happened, officers of the law. Burns could hardly have retained any subjective expectation of privacy in the straw.

And even if Burns somehow expected privacy, his expectation was not the kind that society is prepared to recognize as reasonable. "When a person

voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable . . . ." *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005). "There can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel v. United States*, 362 U.S. 217, 241 (1960). And we agree with the State that Burns voluntarily abandoned the straw. Intent to abandon "may be inferred from words, acts, and other objective facts." *State v. Bumpus*, 459 N.W.2d 619, 625 (Iowa 1990). Burns left the straw behind in a restaurant. He exposed it for collection by anyone who passed by. These acts and objective facts show voluntary abandonment. And, again, "[t]he Fourth Amendment does not protect voluntarily abandoned property." *State v. Grant*, 614 N.W.2d 848, 855 (Iowa Ct. App. 2000) (en banc); *cf. California v. Greenwood*, 486 U.S. 35, 40–41 (1988) (concluding that defendants who "deposited their garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it' . . . could have had no reasonable expectation of privacy in the inculpatory items that they discarded" (citation omitted) (quoting *United States v. Reicherter*, 647 F.2d 397, 399 (3d Cir. 1981))).

To his credit, Burns seems to concede that he abandoned any Fourth Amendment privacy interest in the *straw*. In Burns's view, though, we should treat the DNA *on the straw* as different from the straw itself.

Even if we accept this distinction, though, the two-part "reasonableness test" still leads to the same result. The DNA was on the straw. So when Burns failed to "preserve" the straw "as private," he also failed to "preserve" the straw-

bound DNA "as private," either. *Carpenter*, 138 S. Ct. at 2213 (quoting *Smith*, 442 N.W.2d at 740). Again, he did not take the DNA-laced straw home or to his car, or even to a trash can. Instead, he left the straw—and the DNA—on the Pizza Ranch table so that anyone passing by could collect both the DNA and the straw. In short, just as Burns voluntarily abandoned the straw, he also voluntarily abandoned any DNA attached to the straw. Burns "could have had no reasonable expectation of privacy" in either. *Greenwood*, 486 U.S. at 40–41.

But Burns points out that, *unlike* the straw, *his DNA* was not visible to staff or patrons at the restaurant. Plus, his DNA *profile*—the information that permits identification of the donor—couldn't be obtained without lab analysis involving specialized equipment and technical expertise. So, Burns argues that even after he abandoned the straw, he could still expect his DNA profile to remain private.

We disagree. In *State v. Christian*, the court of appeals concluded that a defendant who voluntarily abandoned a water bottle and fork *also* abandoned any "objective expectation of privacy in the DNA shed on the items." No. 04–0900, 2006 WL 2419031, at *4 (Iowa Ct. App. Aug. 23, 2006). We think this is the right approach—and we think it applies equally to a profile created from the DNA that Burns abandoned at the Pizza Ranch. Indeed, like the State, we see no practical difference between (1) DNA that a rapist leaves behind at a crime scene and (2) the DNA that Burns left on the straw at the Pizza Ranch. In both situations, a casual observer would not be able to see any DNA, much less any DNA profile. Rather, in both cases, DNA profiles would have to be developed using technical

expertise and equipment. In our view, though, neither situation involves an expectation of privacy that society would be prepared to recognize as reasonable. *See Wilson v. State*, 752 A.2d 1250, 1272 (Md. Ct. Spec. App. 2000) ("Once an individual's fingerprints and/or his blood sample for DNA testing are in lawful police possession, that individual is no more immune from being caught by the DNA sample he leaves on the body of his rape victim than he is from being caught by the fingerprint he leaves on the window of the burglarized house or the steering wheel of the stolen car.").

Other courts have reasoned similarly. *See, e.g., State v. Emerson*, 981 N.E.2d 787, 792 (Ohio 2012) (noting that "numerous courts around the country" have concluded "a person has no reasonable expectation of privacy in his or her DNA profile extracted from a lawfully obtained DNA sample"). As one commentator summarized, "Courts have uniformly rejected Fourth Amendment protection against surreptitious harvesting of out-of-body DNA by the police." Albert E. Scherr, *Genetic Privacy & the Fourth Amendment: Unregulated Surreptitious DNA Harvesting*, 47 Ga. L. Rev. 445, 454 (2013). "By and large, [courts] have found (1) that the putative suspect abandoned the item upon or in which the DNA-laden cells were found and (2) as a result, there was no expectation of privacy in the item or that which it was in or on." *Id.*

In Burns's view, though, DNA isn't *voluntarily* abandoned because humans are constantly and *involuntarily* shedding DNA through hair loss, skin flakes, sneezes, and so on. For purposes of this case, though, we don't need to consider every possible form of DNA loss or DNA collection. *See Book v.*

*Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 596 (Iowa 2015) ("We decide only the case before us."). Rather, we only have to consider whether the Fourth Amendment protects the DNA that Burns left on one clearly identifiable item: the drinking straw that Burns voluntarily placed in his own mouth, and then voluntarily left on the Pizza Ranch table *even though* Burns could have instead chosen to keep the straw (and its DNA) private by taking them to his car or home. We think it does not.

Even if we lump Burns's situation in with less voluntary forms of DNA loss, the same outcome might still hold. Although it is true that humans distribute DNA continually and unconsciously, the same is true of latent fingerprints (not to mention footwear impressions, tire tracks, and other impression evidence). Like our DNA, we leave fingerprints everywhere—and generally without volition. Thomas D. Holland, *Novel Features of Considerable Biologic Interest the Fourth Amendment and the Admissibility of Abandoned DNA Evidence*, 20 Colum. Sci. & Tech. L. Rev. 271, 310 (2019) [hereinafter Holland] ("[F]ingerprints, like DNA, are involuntarily 'abandoned' in prodigious amounts on the items that we touch."). Fingerprints share other features with DNA as well. Of course, "[b]oth fingerprints and DNA are powerful means of individual identification." *Id.* Also, just as DNA is not visible to the unaided eye, that's ordinarily true of latent fingerprints as well. *Dactyloscopy*, Britannica, https://www.britannica.com/topic/dactyloscopy#ref1231149 [https://perma.cc/M9KK-HRHD]. And—like DNA profiles—latent fingerprints are developed with the aid of specialized technology. *See* Div. Crim. Investigation, *Criminalistics Laboratory - Latent Print*

*& Identification Section,* https://dps.iowa.gov/divisions/criminal-investigation/criminalistics-laboratory/latent-print-identification-section [https://perma.cc/8F2E-S6NM] ("The techniques used in the development of latent prints range from traditional fingerprint powdering techniques and superglue fuming, to advanced techniques such as fluorescent dye stains and alternate light sources."). Even so, the time-honored process of collecting latent fingerprints—and then using them to identify perpetrators—seems to raise no Fourth Amendment concerns. Certainly, no one suggests that police would have needed a warrant to collect fingerprints from the cup that Burns left behind at the Pizza Ranch—or to use those fingerprints to determine whether Burns was in Martinko's car on the night of her murder.[4] We think the same is true of the DNA that Burns left on the straw—and that ultimately connected him with Martinko's dress. *See Maryland v. King,* 569 U.S. 435, 458 (2013) (drawing analogy between fingerprinting and DNA technology).

But Burns claims DNA is different from fingerprints because—although fingerprints can only be used for identification[5]—DNA analysis reveals vast amounts of private information, like "genetic defects, predispositions to diseases," and perhaps even genetic likelihood for noncriminal behaviors that are, nevertheless, "socially disfavored." *United States v. Kincade,* 379 F.3d 813,

---

[4]To be clear, police were unable to find human fingerprints in Martinko's car. Rather, as mentioned, it appears that the murderer wore rubber gloves to prevent law enforcement from retrieving any fingerprints.

[5]This may underestimate the usefulness of fingerprints. *See* Holland, 20 Colum. Sci. & Tech. L. Rev. at 315–17 (noting other possible information that can be determined through analysis of fingerprints).

850 (9th Cir. 2004) (Reinhardt, J., dissenting). In Burns's view, then, DNA analysis is more like the cell phone site location information (CSLI) records at issue in *Carpenter v. United States*, 138 S. Ct. at 2211. Those "detailed, encyclopedic" records—which provided an "all-encompassing record" of the *Carpenter* suspect's location over a course of 127 consecutive days—can give law enforcement "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.' " *Id.* at 2216–17 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). So, the Court believed, "These location records 'hold for many Americans the "privacies of life." ' " *Id.* at 2217 (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)). For this and other reasons, the *Carpenter* Court held that "when the Government accessed CSLI from [a suspect's] wireless carriers, it invaded [the suspect's] reasonable expectation of privacy in the whole of his physical movements." *Id.* at 2219.

We think *Carpenter* is distinguishable on two grounds. First, the *Carpenter* Court said that its decision "is a narrow one." *Id.* at 2220. "We do not express a view on matters not before us," the Court said. *Id.* We take the Court at its word. So, as a technical matter, we read *Carpenter* as limited to CSLI or very similar technologies that can provide police with *comprehensive* surveillance of a person's *physical movements*. And that is not the kind of information that police obtained through Burns's DNA. The DNA from the Pizza Ranch straw helped police establish one fact, namely, that Burns's DNA profile matched with DNA

found on Martinko's dress. As far as *location* goes, the DNA provided almost no information. At most, it supported an inference that Burns was at one particular location (in Martinko's car) at some point on one particular night (December 19, 1979). That doesn't approach the comprehensive surveillance described in *Carpenter*.

Moreover, while we appreciate that *some* forms of DNA analysis may provide remarkable windows into deeply personal information, we remain focused on the facts of "the case before us." *Book*, 860 N.W.2d at 596. And the case before us is about *one* particular instance of DNA analysis, namely, analysis of DNA from the straw that Burns left behind at the Pizza Ranch. *That* analysis did *not* reveal the kinds of personal information—like "genetic defects" or "predispositions to disease"—that free citizens might expect to keep private. *Kincade*, 379 F.3d at 850. Rather, according to the lab report, the straw analysis only revealed that "[t]he weak DNA profile developed from the ends of the straw indicated a male source," and—most importantly—the "DNA donor could NOT be eliminated as the major contributor to the DNA profile previously developed" from a stain on Martinko's dress.[6] We see little difference between this report and, say, a lab report that connects fingerprints from a discarded cup with fingerprints found at a crime scene.[7] Neither report could provide much insight

---

[6]The full lab report is included in Appendix A. Note that the report includes analysis of the straw collected from the Pizza Ranch as well as some items collected from Donald's trash. The Pizza Ranch straw is labeled as item 49.

[7]It is true that the DNA report also gave the donor's sex. But it appears fingerprint analysis can also be used to determine sex. Holland, 20 Colum. Sci. & Tech. L. Rev. at 315 ("Studies by anthropologists and medical researchers suggest that both the size and density of fingerprint ridges are statistically linked to the sex of the individual, and scientists also have

into the "familial, political, professional, religious, [or] sexual associations" mentioned in *Carpenter*, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). Neither situation involves technological encroachment into those "privacies of life" that *Carpenter* sought to protect. *Id.* (quoting *Riley*, 573 U.S. at 403).

By way of conscious repetition, though, "[w]e decide only the case before us." *Book*, 860 N.W.2d at 596. We do not foreclose the possibility that *other* kinds of warrantless DNA analysis might require a different result. For instance, as the State notes, "[p]erhaps" if police had used different techniques to "catalogue[] numerous traits about" Burns's "physiology and health conditions (like genetic predispositions to cancer or the like), there would be some merit to the . . . privacy complaints" raised by Burns and the amici. But that is not the case before us. And after careful consideration of the case before us, we conclude that the Fourth Amendment did not require police to obtain a warrant before collecting the straw or before analyzing DNA on the straw to determine whether it matched DNA found on Martinko's dress. So the Fourth Amendment did not require suppression.

3. *Section 8.* Burns also argues that even if the Fourth Amendment to the United States Constitution does not apply, suppression was still required by article I, section 8 of the Iowa Constitution. We disagree.

---

shown that the amino acids left behind in sweat deposited with the fingerprint varies with sex as well." (footnote omitted)).

a. *Burns's general argument.* Burns's state constitution analysis begins with the general premise that section 8 *categorically* "provides greater protection of individual privacy than the Fourth Amendment." We reject this premise. *See, e.g., State v. Beckett,* 532 N.W.2d 751, 755 (Iowa 1995) (citing cases and stating, "We have consistently declined to provide greater protection under article I, section 8 of the Iowa Constitution than the United States Supreme Court has found in the Fourth Amendment."). As explained, it is our duty to independently interpret section 8 based on its words and history. Depending on the issue, this inquiry may lead us to conclude that section 8 provides protections that are the same as, greater than, or less than the protections provided by the Fourth Amendment.

b. *Burns's specific arguments.* Burns also raises two specific arguments about section 8. First, Burns claims that analysis of his discarded DNA was a trespass and, therefore, the analysis violated section 8 as interpreted in *State v. Wright,* 961 N.W.2d 396. Second, and alternatively, Burns again claims a reasonable expectation of privacy in his discarded DNA. We address these arguments in turn.

i. *Trespass and* Wright. We begin with Burns's claim under *Wright.* In *Wright* we held that because a Clear Lake ordinance prohibited anyone except a "licensed collector" from collecting trash, and because police did not qualify as a "licensed collector" of trash, police lacked any legal right to dig around in trash that a homeowner had left out for collection. *Id.* at 419–20. By doing so, police

had unlawfully trespassed on the homeowner's "papers" and "effects" in violation of section 8. *Id.* at 417.

Burns claims the same is true here because Iowa Code section 729.6(3) (2019) prohibited police from collecting his DNA and "performing genetic testing of him without his informed written consent." We disagree for two reasons. First, we do not believe section 729.6(3) applies here. It states in pertinent part:

> 3. *a.* A person shall not obtain genetic information or samples for genetic testing from an individual without first obtaining informed and written consent from the individual or the individual's authorized representative.
>
> *b.* A person shall not perform genetic testing of an individual or collect, retain, transmit, or use genetic information without the informed and written consent of the individual or the individual's authorized representative.
>
> *c. The following exceptions apply to the prohibitions in paragraphs "a" and "b":*
>
> . . . .
>
> (2) *To identify an individual in the course of a criminal investigation by a law enforcement agency.*

*Id.* (emphasis added).

As its text makes clear, section 729.6(3) imposes limits on the collection and use of genetic information. But paragraph (*c*)(2) makes it equally clear that the statute's prohibitions don't apply to law enforcement's efforts to "identify an individual in the course of a criminal investigation." *Id.* § 729.6(3)(*c*)(2). That is what happened here: law enforcement collected and analyzed Burns's DNA as part of their effort to "identify an individual"—the unidentified individual who left DNA on Martinko's dress.

Burns responds that "[c]onsidering the rules of construction," paragraph (*c*)(2) can only apply when law enforcement has a "warrant." We disagree. "We must look to the statute as it is written." *Moss v. Williams*, 133 N.W. 120, 121 (Iowa 1911). As written, paragraph (*c*)(2) includes no mention of a "warrant." If the legislature had intended it to require a warrant, the legislature "could easily have so stated." *Hansen v. Haugh*, 149 N.W.2d 169, 172 (Iowa 1967). And we can't create a new requirement that the legislature chose not to enact. *See id.* (citing Iowa Const. art. III, § 1).

We recognize that Burns's statutory argument is tied up with constitutional concerns. We also recognize that when there are "competing plausible interpretations of a statutory text," we may rely on the presumption that our legislature "did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381–82 (2005); *see* Iowa Code § 4.4(1) ("In enacting a statute, it is presumed that . . . [c]ompliance with the Constitutions of the state and of the United States is intended."). But here there are no "competing plausible interpretations of a statutory text." *Clark*, 543 U.S. at 381; *see In re Guardianship of Kennedy*, 845 N.W.2d 707, 714 (Iowa 2014) ("We have interpreted *ambiguous* statutes in the past to avoid constitutional problems." (emphasis added)). There is no "plausible" interpretation that would require a warrant. The statute does not mention "warrants" or any synonym.

Second, and in any event, the statute is not relevant under the trespass standard set forth in *Wright*. As mentioned above, and as the *Wright* court emphasized, "section 8 provides that people have the right to be secure in 'their'

persons, houses, papers, and effects." *Wright*, 961 N.W.2d at 415 (quoting Iowa Const. art. I, § 8). "Although phrased in the plural, '[t]he obvious meaning of ["their"] is that *each* person has the right to be secure against unreasonable searches and seizures in *his own* person, house, papers, and effects.' " *Id.* (alterations in original) (quoting *Carpenter*, 138 S. Ct. at 2241–42 (Thomas, J., dissenting)). In *Wright*, we explained that section 8 "precludes a peace officer from engaging in general criminal investigation that constitutes a trespass against a citizen's house, papers, or effects." *Id.* at 417. Here, however, the police did not trespass against or otherwise seize or search Burns's person, his house, his papers, or his effects. So, *Wright* does not apply.

ii. *Reasonable expectation of privacy.* Next Burns claims that—like the Fourth Amendment—section 8 also protects his reasonable expectation of privacy in the straw-bound DNA. Indeed, Burns claims his reasonable-expectation claim is even stronger under the Iowa Constitution because—as mentioned—Burns thinks that Iowa Code section 729.6(3) prohibited Iowa law enforcement officers from collecting or analyzing his DNA.

We disagree. As a preliminary matter, we note that the text of section 8 does not mention "expectations" or "privacy." But the parties agree that, like the Fourth Amendment, section 8 protects "reasonable expectations of privacy." Our cases offer support for this view. *See, e.g., State v. Gaskins*, 866 N.W.2d 1, 16 (Iowa 2015) ("The protections of article I, section 8 against warrantless searches are not meant to benefit the public generally. They are meant to protect individual citizens and their reasonable expectations of privacy.").

In any event, for the same reasons we discussed with regard to the Fourth Amendment, we conclude that the collection and analysis of Burns's DNA did not invade any privacy expectations that are protected by section 8. We note also that, as discussed, Iowa Code section 729.6(3)(*c*)(2) plainly permits Iowa law enforcement to collect and analyze genetic material to "identify an individual in the course of a criminal investigation." So Burns could have no reasonable expectation that Iowa law enforcement would refrain from using his DNA in their efforts to identify Martinko's killer. On the contrary, given the "unparalleled ability" of DNA technology "to exonerate" the innocent and "to identify the guilty," Iowans should fully expect that law enforcement agencies would use that technology to solve difficult cases like Martinko's murder. *King*, 569 U.S. at 442 (quoting *Dist. Atty's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 55 (2009)) ("Since the first use of forensic DNA analysis to catch a rapist and murderer in England in 1986, law enforcement, the defense bar, and the courts have acknowledged DNA testing's 'unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly improve both the criminal justice system and police investigative practices.'" (citation omitted) (quoting *Osborne*, 557 U.S. at 55)).

4. *Conclusion.* Police did not violate the Fourth Amendment to the United States Constitution or article I, section 8 of the Iowa Constitution by collecting the straw that Burns discarded at the Pizza Ranch, or by analyzing the DNA on the straw to determine whether it would match DNA found on Martinko's dress. The district court did not err by declining to suppress the State's DNA evidence.

**B. Did the District Court Err by Refusing to Give a Requested Jury Instruction?** Burns also argues that the district court abused its discretion by declining to give an instruction regarding federal sentencing law. We disagree. *See State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019) ("[W]e review the refusal to give a cautionary jury instruction for abuse of discretion.").[8]

As explained, Michael Allison was a federal detainee who bunked near Burns in the Cedar Rapids jail. At Burns's trial, Allison testified about incriminating remarks Burns had made. For instance, according to Allison, "he had told me, if I keep beating him in pinochle, he was going to have to take me to the mall." Pretty troubling—one might infer—since Burns was accused of murdering Martinko in a mall parking lot.

On cross-examination, Allison conceded that he had a substantial criminal record. He had already been to federal prison on several occasions. And at the time of Burns's trial, Allison was facing a new federal indictment for conspiracy to distribute methamphetamine, which carries a mandatory minimum prison sentence of fifteen years and a maximum sentence of life. Allison said that he had previously negotiated a deal to resolve the conspiracy charge—but then he later "pulled" the deal, apparently at his lawyer's advice. So, by the time of Burns's trial, he had no "active" plea agreement with the government. Allison said that he was waiting for a new deal, which—he hoped—would change his

---

[8]The State suggests that the standard of review is for correction of errors at law. Under either standard, we find no grounds for reversal.

range of possible prison sentences "from 15 to life" to a range of "zero to 20" years.

Allison admitted that he was "very familiar" with the federal sentencing guidelines, the "cookbook" that guides sentencing in the federal system. Allison acknowledged that the guidelines allow federal prosecutors "to ask" the court to impose "a lesser sentence" than what the guidelines would otherwise "call for" if Allison "cooperate[d] with the prosecution or investigation" of another suspect. And Allison acknowledged that he[9] had gone to law enforcement with information about Burns, i.e., the incriminating remarks we have already discussed. Allison also acknowledged that—through his testimony in Burns's murder trial—he was indeed cooperating with law enforcement. But, Allison explained, he had no "cooperation agreement" that would require federal prosecutors to make any request for leniency in return for his cooperation. According to Allison, he had not "received any kind of promise of a plea agreement or a deal to testify" against Burns.[10] Indeed, Allison maintained that he had never talked to federal prosecutors about cooperation. When defense counsel asked Allison if he was "using Jerry Burns as a bargaining chip to try to get a better sentence" for his federal conspiracy case, Allison responded, "No, sir, not at all."

In response to Allison's testimony, the defense asked for a jury instruction concerning federal sentencing law. Here is the text of the proposed instruction:

---

[9]Allison said he conveyed the information to his lawyer who then conveyed the information to law enforcement.

[10]This testimony was given on redirect.

You have heard that witness Michael Allison was earlier convicted of crimes. You may use that evidence only to help you decide whether to believe the witness and how much weight to give his testimony.

You have also heard [evidence] that Michael Allison hopes to receive a reduced sentence on criminal charges pending against him in return for his cooperation with the prosecution in this case. Michael Allison entered into an agreement with the United States Attorney for the Northern District of Iowa which provides that in return for his assistance, the government may recommend a less severe sentence which could be less than the mandatory minimum sentence for the crime with which he is charged. Michael Allison is subject to a mandatory minimum sentence, that is, a sentence that the law provides must be of a certain minimum length. If the prosecutor handling this witness's case believe[s] he provided substantial assistance, the prosecutor can file in the court in which the charges are pending against the witness a motion to reduce his sentence below the statutory minimum. The judge has no power to reduce the sentence for substantial assistance unless the government, acting through the United States Attorney, files such a motion. If such a motion for reduction of sentence for substantial assistance is filed by the prosecution, then it is up to the judge to decide whether to reduce the sentence at all, and if so, how much to reduce it.

You may give testimony of this witness such weight as you think it deserves. Whether or not testimony of a witness may have been influenced by his hope of receiving a reduced sentence is for you to decide.

Burns's counsel explained that "this is a standard instruction given in the Eighth Circuit district courts, and it gives guidance to the jury to view the testimony of a witness for whom some consideration is being given in exchange for the witness' cooperation or testimony on behalf of the prosecution." Counsel acknowledged that because Allison had been less than "forthright about why he's testifying against" Burns, the instruction "could be modified" to say that "if you find that Michael Allison hopes to receive a reduced sentence on criminal charges pending against him, et cetera, you can then consider that in giving the weight

to his evidence." Otherwise, though, counsel believed the "factual predicates for th[e] instruction were admitted by" Allison.

The district court declined to give the instruction. Instead, the court gave "stock" state-court instructions to guide the jury's consideration of Allison's testimony. Specifically, Jury Instruction No. 11 listed factors the jury may consider when deciding what testimony to believe, including "[t]he witness's interest in the trial, their motive, candor, bias and prejudice." And Jury Instruction No. 15 stated, "The witness Michael Allison has admitted he was convicted of a crime. You may use that evidence only to help you decide whether to believe the witness and how much weight to give his testimony."

On appeal, Burns claims that the district court erred by giving these instructions instead of his proposal. Burns argues that because the proposed instruction correctly reflected federal sentencing law, the court had no choice but to give the instruction. We disagree. Burns does not cite, and we have not found, any authority that requires Iowa trial courts to instruct jurors about state or federal sentencing law simply because a witness's testimony may be influenced by pending charges or—more to the point—the possibility that the witness may receive a lighter sentence because of their testimony. And although the trial court must "instruct a jury on all legal issues presented in a case," we don't think an instruction on federal sentencing would have addressed any *legal* issues that the jury had to decide. *Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 265–66 (Iowa 2000) (en banc); *see State v. Davis*, 951 N.W.2d 8, 17 (Iowa 2020) (noting instructions must give the jury "a clear understanding of the

issues *it must decide*" (quoting *Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997) (emphasis added))). Rather, we agree with the State that an instruction about federal sentencing would have been about *facts*. It would have given the jury *facts* about how the sentencing process works and, particularly, how Allison could receive a lesser sentence through cooperation. These are the same kind of facts that Burns's counsel successfully obtained from Allison on cross-examination. And we aren't sure that any more facts were required: Allison made it clear to the jury that—if he cooperated—prosecutors could ask the court to impose "a lesser sentence." If additional facts were needed, though, they should have come in through additional evidence—from Allison or another witness—not a jury instruction.

In any event, when we read the jury instructions as a whole, we find no prejudicial error. The instructions listed factors the jury may consider when deciding what testimony to believe, including "[t]he witness's interest in the trial, their motive, candor, bias and prejudice." And the instructions said that "[t]he witness Michael Allison has admitted he was convicted of a crime. You may use that evidence only to help you decide whether to believe the witness and how much weight to give his testimony." These instructions adequately guided the jury's consideration of Allison's testimony.

Burns has shown no reversible error in the jury instructions.

**C. Was the Evidence Sufficient to Support Burns's Conviction?** Finally, Burns argues that there was not sufficient evidence to support the murder verdict. We disagree.

"We review sufficiency-of-evidence claims for correction of errors at law." *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* (alteration in original) (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)).

Martinko was brutally murdered during a vicious struggle in her Buick. Burns does not dispute this. Instead, Burns only raises an identity issue, a claim that *he* wasn't the murderer. But there was ample evidence from which a jury could conclude that he was. The DNA from Burns's buccal swab was consistent with the DNA found on Martinko's dress to a probability of 1 out of 100 billion unrelated persons.

Plus, Burns's DNA matched the profile obtained from the Buick's gearshift lever. This match was close enough to eliminate about 99.94% of all males in the United States.

Also, law enforcement observed "noticeable" scars on both of Burns's hands and arms. He could have received the cuts during a bloody struggle with Martinko.

Finally, a jury could reasonably conclude that Burns's statements to Allison were oblique admissions of guilt. Burns even autographed a news story about Martinko's murder.

Viewing the evidence "in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence,'" we conclude the verdict was adequately

supported. *Jones*, 967 N.W.2d at 339 (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)).

### III. Conclusion.

Burns has not shown reversible error. We affirm the judgment of the district court.

### AFFIRMED.

Christensen, C.J., and Waterman, Mansfield, and McDonald, JJ., join this opinion. McDonald, J., files a concurring opinion. Oxley, J., files a dissenting opinion. McDermott, J., files a dissenting opinion, in which Oxley, J., joins except as to part I.B.

# Appendix A

E-FILED 2020 FEB 07 1:50 PM LINN - CLERK OF DISTRICT COURT

Cross-reference DCI Case 1971-703, 1972-635, 1972-885, 1980-6274, 2006-13798 and 2007-733



Official Report Of
**Iowa Department of Public Safety**
**DCI Criminalistics Laboratory**
2240 South Ankeny Boulevard
Ankeny, Iowa 50023-9093
(515) 725-1500

**1985-6117 Report 39**
LAB CASE NUMBER

**11/05/2018**
REPORT DATE

**DNA Report**

See Code of Iowa Section 691.2 Presumption of qualification - evidence – testimony. "It shall be presumed that any employee or technician of the criminalistics laboratory is qualified or possesses the required expertise to accomplish any analysis, comparison, or identification done by the employee's employment in the criminalistics laboratory. Any report, or copy of a report, or the findings of the criminalistics laboratory shall be received in evidence, if determined to be relevant, in any court, preliminary hearing, grand jury proceeding, civil proceeding, administrative hearing, and forfeiture proceeding in the same manner and with the same force and effect as if the employee or technician of the criminalistics laboratory who accomplished the requested analysis, comparison, or identification had testified in person..."

| | | | |
|---|---|---|---|
| **AGENCY:** | Cedar Rapids Police Department | **CASE TYPE:** | Death Investigation |
| **AGENCY CASE NUMBER:** | 1979-25441 | **OFFENSE DATE:** | December 19, 1979 |
| **CASE OFFICER:** | David Zahn | **REPORT OF:** | Michael Schmit |
| **SUSPECT(S):** | Suspect Names Redacted | **VICTIM(S):** | Michelle Marie Martinko |

## ITEMS AS DESCRIBED BY SUBMITTING AGENCY:

On October 30, 2018, Kraig Kruger with Cedar Rapids Police Department submitted the following item(s) to Stacie Prall (DCI Lab):

| Lab # | Agency # | Description |
|---|---|---|
| 49 | JB1 | Straw. Collected immediately after being used by Jerry Burns. |
| 50 | DB1A | Straw w/ lid. Collected from garbage of Donald Burns. |
| 51 | DB1B | Drinking glass. Collected after being used by Donald Burns. |
| 52 | DB1C | Bandage w/ blood. Collected from garbage of Donald Burns. |
| 53 | DB1D | Toothbrush. Collected from garbage of Donald Burns. |

## EXPLANATION

The polymerase chain reaction (PCR) was used to amplify twenty-one (21) short tandem repeat (STR) loci and 3 sexing loci. The loci targeted and amplified are D3S1358, vWA, D16S539, CSF1PO, TPOX, Y-Indel, Amelogenin, D8S1179, D21S11, D18S51, DYS391, D2S441, D19S433, TH01, FGA, D22S1045, D5S818, D13S317, D7S820, SE33, D10S1248, D1S1656, D12S391, and D2S1338. The composite result of testing at each locus is termed an individual's DNA profile.

The STR kit that the Iowa DCI Crime Lab uses to process DNA samples was changed in January 2017 and now includes 21 STR loci per the requirements of the FBI. The questioned profiles from Items 49 through 53 were developed using the current 21 STR loci. The questioned profile from Item F was previously developed using 15 STR loci. Comparisons were made using the 13 STR loci that are common to both kits.

**RESULTS OF EXAMINATION**

49        The weak DNA profile developed from the ends of the straw indicated a male source. The DNA donor could NOT be eliminated as the major contributor to the DNA profile previously developed from stain #F5 (see DNA report dated 12/5/2005) from the black dress (described as "Item F1" on DNA report dated 9/8/2003).

Further interpretation may be attempted if a KNOWN DNA sample from a potential source is submitted.

Linn
Page 1 of 2

E-FILED 2020 FEB 07 1:50 PM LINN - CLERK OF DISTRICT COURT **Lab Case#:** 1985-6117 **Report#:** 39 **Agency Case#:** 1979-25441 **Michael Schmit**

50        The DNA profile developed from the mouth end of the straw indicated a mixture of at least two individuals that was too weak for conclusive interpretation. The lid was not examined.

51        The DNA profile developed from the mouth area of the drinking glass indicated a mixture of at least four individuals. No further conclusions could be made.

52        The DNA profile developed from the stained area on the gauze indicated a female source. The DNA donor was eliminated as the major contributor to the DNA profile previously developed from stain #F5.

53        The DNA profile developed from the toothbrush bristles indicated a male source. The DNA donor was eliminated as the major contributor to the DNA profile previously developed from stain #F5.

**DISPOSITION OF EVIDENCE**

The evidence will be returned to the DCI laboratory evidence room.

This report may contain opinions, conclusions or interpretations of the examiner whose signature appears below.

_Michael N. Schmit_ (signature)

Michael Schmit, Criminalist

Page 2 of 2

**McDONALD, Justice (concurring).**

> The words of the Fourth Amendment really do mean what they say. They do not require warrants, even presumptively, for searches and seizures. They do not require probable cause for all searches and seizures without warrants. They do not require—or even invite— exclusions of evidence, contraband, or stolen goods. All this is relatively obvious if only we read the Amendment's words carefully and take them seriously . . . .

Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 761 (1994) [hereinafter Amar].

Modern search and seizure doctrine does not take the words of the federal or state constitutions seriously. As a result, search and seizure doctrine "today is an embarrassment." *Id.* at 757; *see State v. Wright*, 961 N.W.2d 396, 410 (Iowa 2021) (stating "[c]urrent Fourth Amendment jurisprudence is a mess" and collecting authorities). The three pillars of modern search and seizure doctrine— the warrant requirement, the probable cause requirement, and the exclusionary rule—are "initially plausible but ultimately misguided. As a matter of text, history, and plain old common sense, these three pillars of modern Fourth Amendment case law are hard to support." Amar, 107 Harv. L. Rev. at 757 (footnote omitted). I join the court's well-reasoned opinion because it correctly resolves Burns's federal and state constitutional claims under the controlling precedents. I write separately to address the third pillar of modern search and seizure doctrine—the exclusionary rule—under federal and state law.

I.

The federal exclusionary rule, as applied in state courts, is of relatively recent origin. In *Boyd v. United States* and *Weeks v. United States*, the United States Supreme Court held evidence obtained in violation of the Federal Constitution was inadmissible in federal criminal proceedings. *Boyd*, 116 U.S. 616, 638 (1886), *abrogated as recognized by Fisher v. United States*, 425 U.S. 391 (1976); *Weeks*, 232 U.S. 383, 398 (1914), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961). In *Wolf v. Colorado*, the Supreme Court held the principles underlying the Fourth Amendment were "enforceable against the States through the Due Process Clause." *Wolf*, 338 U.S. 25, 27–28 (1949), *overruled on other grounds by Mapp*, 367 U.S. 643. *Wolf* specifically declined, however, to require state courts to adopt the exclusionary rule as a remedy. *Id.* at 33. In *Mapp v. Ohio*, the Supreme Court overruled *Wolf*, in part, and held state courts were required to apply the exclusionary rule for violations of the right recognized in *Wolf*. *Mapp*, 367 U.S. at 654–57; *see United States v. Janis*, 428 U.S. 433, 443–47 (1976) (discussing history of exclusionary rule).

The conclusion that the Fourth Amendment requires the exclusion of relevant and reliable evidence in state court criminal proceedings "could not withstand even the slightest scrutiny." *Collins v. Virginia*, 138 S. Ct. 1663, 1677 (2018) (Thomas, J., concurring). "The exclusionary rule appears nowhere in the Constitution, postdates the founding by more than a century, and contradicts several longstanding principles of the common law." *Id.* "Supporters of the exclusionary rule [could not and] cannot point to a single major statement from

the Founding—or even the antebellum or Reconstruction eras—supporting Fourth Amendment exclusion of evidence in a criminal trial." Amar, 107 Harv. L. Rev. at 786. "Indeed, the idea of exclusion was so implausible that it seems almost never to have been urged by criminal defendants . . . in the vast number of criminal cases litigated in the century after Independence." *Id.*

Dean Wigmore was particularly critical of the Court's new exclusionary rule jurisprudence. He explained that "it has long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence." John H. Wigmore, *Using Evidence Obtained by Illegal Search and Seizure*, 8 A.B.A. J. 479, 479 (1922). He explained the exclusionary rule misapprehended the nature of the right. *Id.* at 482. The Fourth Amendment "implies both a civil action by the citizen thus disturbed and a process of criminal contempt against the offending officials." *Id.* at 481. It was fallacious to conclude the Fourth Amendment required "a novel exception . . . to the fundamental principle that an illegality in the mode of procuring evidence is no ground for excluding it." *Id.* at 482 (emphasis omitted) (citation omitted).

In two memorable passages, Dean Wigmore explained the exclusionary rule actually perverts the administration of justice. *See id.* at 482, 484. In the first passage, he explained the exclusionary rule undermines the foundations of justice:

> All this is misguided sentimentality. For the sake of indirectly and contingently protecting the Fourth Amendment, a Court appears indifferent to what is the direct and immediate result, viz.,

of making Justice inefficient, and of coddling the criminal classes of the population. It puts Supreme Courts in the position of assisting to undermine the foundations of the very institutions they are set there to protect. It regards the over-zealous officer of the law as a greater danger to the community than the unpunished murderer or embezzler or panderer.

*Id.* at 482. In the second passage Wigmore explained the exclusionary rule commits two separate wrongs: it excuses the criminal conduct of the defendant, and it excuses the unlawful conduct of the offending officer.

> "Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else."

*Id.* at 484.

Given the lack of historical or doctrinal support for the rule, the Court has walked back the notion that the admission of evidence obtained by way of unlawful search and seizure violates the Fourth Amendment. The Court has "emphasized repeatedly that the governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362 (1998). Instead, the exclusionary rule is a "judicial remedy to deter Fourth Amendment violations." *Utah v. Strieff*, 579 U.S. 232, 237 (2016); *see Herring v. United States*, 555 U.S. 135, 141 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation"); *Scott*, 524 U.S. at 363 ("The

exclusionary rule is instead a judicially created means of deterring illegal searches and seizures."); *United States v. Calandra*, 414 U.S. 338, 348 (1974) ("[T]he [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.").

As a judicially created remedy and not a constitutional right in and of itself, the Court has decided the exclusionary "does not 'proscribe the introduction of illegally seized evidence in all proceedings or against all persons.'" *Scott*, 524 U.S. at 363 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). It is inapplicable in habeas proceedings. *Powell*, 428 U.S. at 493–96. It is inapplicable in federal civil tax proceedings. *Janis*, 428 U.S. at 459–460. It is inapplicable in federal civil deportation proceedings. *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1050–51 (1984). It is inapplicable in parole revocation proceedings. *Scott*, 524 U.S. at 369. It is inapplicable in grand jury proceedings. *Calandra*, 414 U.S. at 353–55. Even in criminal proceedings, the exclusionary rule is no longer automatic. *Lange v. California*, 141 S. Ct. 2011, 2026 (2021) (Thomas J., concurring) ("Establishing a violation of the Fourth Amendment, though, does not automatically entitle a criminal defendant to exclusion of evidence. Far from it."). The "significant costs of this rule" make it applicable only where its "deterrence benefits outweigh its substantial social costs." *Strieff*, 579 U.S. at 237–38 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the

justice system. As laid out in [the Court's] cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144.

The officers' conduct here is not sufficiently culpable such that the cost of deterrence is worth the price paid by the justice system. Here, in obtaining the saliva sample from the discarded straw, the officers did not trespass upon Burns's person, house, papers, or effects. *See Carpenter v. United States*, 138 S. Ct. 2206, 2241–42 (2018) (Thomas, J., dissenting) ("[T]he obvious meaning of ['their'] is that each person has the right to be secure against unreasonable searches and seizures in *his own* person, house, papers, and effects" (second alteration in original) (quoting *Minnesota v. Carter*, 525 U.S. 83, 92 (1998) (Scalia, J., concurring))). Further, the officers collected the straw pursuant to a statute authorizing the collection and use of DNA for the purposes of criminal investigation. *See* Iowa Code § 729.6(3)(*c*)(2) (2019). "It is one thing for the criminal 'to go free because the constable has blundered.' It is quite another to set the criminal free because the constable has scrupulously adhered to governing law." *Davis v. United States*, 564 U.S. 229, 249–50 (2011) (citation omitted) (quoting *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926)). In addition, the officers did not obtain "deeply revealing" information about Burns. *Carpenter*, 138 S. Ct. at 2223 (majority opinion). In short, there is nothing in the Fourth Amendment, as originally understood or under current doctrine, that requires a state court to exclude from evidence a relevant and reliable lab report confirming

a single, discrete fact where the investigating officers obtained the biological sample analyzed in the report pursuant to a state statute.

## II.

Under the Iowa Constitution, the exclusion of relevant and reliable evidence as a judicially-created penalty for an unlawful search or seizure is legal fiction contrary to the constitutional text, constitutional design, and more than a century's worth of precedents faithfully applying and implementing the same. The fundamental defect of the exclusionary rule, as it relates to seizures and searches under article I, section 8 of the Iowa Constitution, is not that it is a bad remedy, it is that it is no remedy at all given the nature of the constitutional right as expressed in the constitutional text and design as originally understood and implemented. *See State v. Nelson*, 300 N.W. 685, 688 (Iowa 1941) (explaining the exclusionary rule "has a strange sound" for a remedy when the constitutional prohibition is "viewed in the light of its origin and history").

## A.

In 1857, the people of this state did "ordain and establish a free and independent government, by the name of the State of Iowa." Iowa Const. pmbl. The constituted government has almost plenary power to protect the "lives, limbs, health, comfort, and quiet of all persons" within its borders, to protect "all property within the state," and, more generally, to promote "domestic order, morals, health, and safety." *State v. Schlenker*, 84 N.W. 698, 699 (Iowa 1900) (quoting *R.R. Co. v. Husen*, 95 U.S. 465, 471 (1877)); *see Fuller v. Chi. & N.W.R.R. Co.*, 31 Iowa 187, 209 (1871) (stating the government may act "to preserve the

peace, health, morals and property of its people, and to protect them from imposition and injustice"). Of course, "[t]he police power of the state . . . is subject to the constitution, and cannot be used as a cloak under which to disregard constitutional rights or restrictions." *Schlenker*, 84 N.W. at 699.

The judicial department is vested with the final authority to determine the meaning of the constitution. *See, e.g., Junkins v. Branstad*, 421 N.W.2d 130, 135 (Iowa 1988) (en banc) (stating a constitutional "determination, notwithstanding the legislative definition, is for the courts"); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). In determining the meaning of the constitution, the judicial department is bound to interpret and apply the document as it was understood at the time of its enactment. *See Lennette v. State*, 975 N.W.2d 380, 403 (Iowa 2022) (McDonald, J., concurring); *State v. Thompson*, 954 N.W.2d 402, 415 (Iowa 2021) (examining historical practice to resolve constitutional questions). "The age of the Constitution may develop conditions which make it desirable to amend it; until amended, it is a holy covenant." *Hunter v. Colfax Consol. Coal Co.*, 154 N.W. 1037, 1047 (Iowa 1915). A judge's oath to uphold the constitution contains "neither an express nor implied exception that the oath shall not be binding after the Constitution has been in existence for a stated, or any, length of time. Unless amended, it will be the duty of the judges who serve a hundred years from now to obey this Constitution." *Id.* A judge cannot "disregard the Constitution because it was created in the eighteenth or nineteenth century." *Id.*

Nothing in the text of the Iowa Constitution, as understood at the time of its enactment, requires, or even supports, the exclusion of relevant and reliable evidence in criminal proceedings as a judicially-created penalty for an unlawful search and seizure. Article I, section 8 of the Iowa Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

This constitutional provision says nothing about excluding evidence from criminal trials. *C.f. Davis*, 564 U.S. at 236 ("The [Fourth] Amendment says nothing about suppressing evidence obtained in violation of this command."). As Judge Richard Posner explained with respect to the parallel Fourth Amendment, the Constitution does not protect "the criminal's interest in not being punished." Richard A. Posner, *Rethinking the Fourth Amendment*, 1981 Sup. Ct. Rev. 49, 64 (1981) [hereinafter Posner]. "Sometimes it is argued that there is a . . . right to exclude, but the argument has no support in the text or history or nearly two centuries of judicial interpretation . . . ." *Id.* at 53 (footnote omitted). Quite simply, the textual prohibition against unreasonable searches and seizures "was not intended to give criminals a right to conceal evidence of their crimes." *Id.*

Doctrinally, the exclusionary rule would have been incomprehensible to the founders of our government. "At the time of Iowa's founding, article I, section 8 could not have been understood to establish a substantive standard of 'reasonableness' that regulated the conduct of executive branch officials conducting seizures or searches because there was no conception that such

officials" could violate, or were even subject to, direct regulation under article I, section 8. *Lennette*, 975 N.W.2d at 411. "The modern conception that article I, section 8 created a substantive standard of 'reasonableness' governing seizures and searches is a prochronistic error that imposes, post hoc, principles of state action, agency law, and vicarious liability that run directly counter to the law at the time of Iowa's founding." *Id.* at 412. The founders would thus not have understood suppression as a remedy for an official's violation of article I, section 8 because there was no conception that an official could even violate the constitution. *See* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 554 (1999) [hereinafter Davies] ("Likewise, because unlawful acts by officers were only personal, it never occurred to the Framers to apply an exclusionary principle to such misconduct.").

If article I, section 8 did not set forth a substantive standard that directly regulates the conduct of government officials, then what did and does it do? As explained in *State v. Wright*, the constitutional prohibition against search and seizures "is little more than the affirmance of a great constitutional doctrine of the common law." 961 N.W.2d at 404 (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1894–1895, at 748 (1833)). Article I, section 8 secures "the right to bring nonconstitutional causes of action against government officials for seizures and searches conducted in violation of the law." *Lennette*, 975 N.W.2d at 409 (collecting cases); *see* Amar, 107 Harv. L. Rev. at 786 ("Tort law remedies were thus clearly the ones presupposed by the Framers of the Fourth Amendment and counterpart state constitutional provisions."). It

is a constitutional "injunction against lawmakers," and it prohibits them "from abrogating the preexisting common law regime of rights and remedies." *Lennette*, 975 N.W.2d at 409–10 (collecting cases).[11]

More specifically, article I, section 8 prohibits lawmakers from creating for government officials' special justification defenses to or immunities from common law suits arising out of searches and seizures. *See id.* at 404 ("The authentic historical context in which this right was codified reveals that the nature and scope of the right was to fix in place the common law regime of rights and remedies governing seizures and searches and to prohibit legislative abrogation of the same."); *Wright*, 961 N.W.2d at 400 ("Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen." (quoting *Olmstead v. United*

---

[11]*See Carpenter*, 138 S. Ct. at 2243 (Thomas, J., dissenting) ("[B]y prohibiting 'unreasonable' searches and seizures in the Fourth Amendment, the Founders ensured that the newly created Congress could not use legislation to abolish the established common-law rules of search and seizure."); *Adams v. New York*, 192 U.S. 585, 598 (1904) ("The security intended to be guaranteed by the 4th Amendment against wrongful search and seizures is designed to prevent violations of private security in person and property and unlawful invasion of the sanctity of the home of the citizen by officers of the law, acting under legislative or judicial sanction, and to give remedy against such usurpations when attempted."); *State v. Griswold*, 34 A. 1046, 1047 (Conn. 1896) (explaining the Connecticut Constitution "forbids the legislature to enact any statute, and the courts from passing any rule, which would authorize any unreasonable search or seizure of the goods of a citizen" and stating trespassing officers "would be liable, in a proper action, to pay to the defendant all damage they had done him"); *Williams v. State*, 28 S.E. 624, 627–28 (Ga. 1897) ("That is to say, we believe the framers of the constitutions of the United States and of this and other states merely sought to provide against any attempt, by legislation or otherwise, to authorize, justify, or declare lawful, any unreasonable search or seizure. This wise restriction was intended to operate upon legislative bodies, so as to render ineffectual any effort to legalize by statute what the people expressly stipulated could in no event be made lawful . . . ."), *abrogated by Mobley v. State*, 834 S.E.2d 785 (Ga. 2019); *State v. Fuller*, 85 P. 369, 373 (Mont. 1906) ("The provision in the state and federal Constitutions is therefore a limitation upon the powers of the respective governments declaring all searches and seizures unlawful and forbidding the Legislature and the Congress to authorize them . . . and the redress for the wrong therein denounced is an appropriate action directly against those who have been guilty of trespass.").

*States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347 (1967), *and Berger v. New York*, 388 U.S. 41 (1967))); *see* Posner, 1981 Sup. Ct. Rev. at 61 ("The Fourth Amendment was intended to limit the defense of legal process in tort suits against public officers or agencies . . . ."). As Judge Posner explained, any effort to immunize officers beyond that allowed at common law "would violate the Fourth Amendment, the central purpose of which was to ensure the availability of state remedies for unreasonable searches and seizures." *Id.* at 69.

The understanding that article I, section 8 is a constitutional injunction against lawmakers and not a direct, substantive limitation on the conduct of peace officers is dictated by another provision of the Iowa Constitution. Unlike the Federal Constitution, the Iowa Constitution explicitly sets forth its scope and remedy. Article XII, section 1 of the Iowa Constitution provides, "This Constitution shall be the supreme law of the State, and any law inconsistent there with, shall be void." By its own terms, the Iowa Constitution applies only to laws—whether originating in the legislative, executive, or judicial departments—and provides as a remedy that "any law" inconsistent with the constitution "shall be void." *Id.* It says nothing about the regulation of peace officer conduct. It says nothing about the exclusion of relevant and reliable evidence in criminal proceedings.

Not only is the exclusionary rule not supported or invited by the state constitution, the exclusionary rule is contra-constitutional in numerous respects, two of which I will mention here. First, the exclusionary rule frames

article I, section 8 as a rule of criminal procedure contrary to the constitution's design. Article I, section 8 protects "[t]he right of the people" and not merely the right of the criminally accused. *Id.* art. I, § 8. In contrast, article I, section 10 sets forth the rights of "the accused" in "all criminal prosecutions." *Id.* art. I, § 10. But these rights do not include the exclusion of relevant and reliable evidence as a judicially-created penalty for a peace officer's breach of the law in conducting a search or seizure.

Second, the exclusionary rule is wholly inconsistent with the constitutional criminal jury system. Citizen jurors are called to serve to decide the factual guilt of a criminal defendant. Modern search and seizure doctrine hides relevant and reliable evidence from these citizen servants, interferes with their accurate determination of guilt, and uses citizen jurors as mere instrumentalities to advance other public policy purposes unrelated to their service in the particular case. *Lange*, 141 S. Ct. at 2207 ("One cost is especially salient: excluding evidence under the Fourth Amendment always obstructs the 'truth-finding functions of judge and jury.'" (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984))); Todd E. Pettys, *Instrumentalizing Jurors: An Argument Against the Fourth Amendment Exclusionary Rule*, 37 Fordham Urb. L.J. 837, 871–72 (2010). The judiciary's intentional deception of and instrumentalization of citizen jurors is fundamentally contra-constitutional and wrongheaded. The exclusionary rule subverts the very foundation of the constitution that courts are supposed to protect.

B.

The preceding interpretation of article I, section 8 of the Iowa Constitution is not novel; it is supported by "the contemporaneously expressed understanding of ratified text." Amy Coney Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1924 (2017). "By the time the citizens of Iowa ratified the Iowa Constitution in 1857, it was well established throughout the country" that the legality of searches and seizures were nonconstitutional civil matters in which government officials could assert a defense of justification in response to a tort claim. *Lennette*, 975 N.W.2d at 405–06 (collecting cases). "Iowa's earliest precedents were in accord with the national consensus. Iowa law allowed 'traditional common law tort claims, such as trespass, conversion, malicious prosecution, and abuse of process' to be asserted against government officials." *Id.* at 405–08 (quoting *Godfrey v. State*, 898 N.W.2d 844, 887 (Iowa 2017) (Mansfield, J., dissenting)) (collecting cases). A peace officer's means and methods of search and seizure were not of constitutional concern. *See, e.g.*, *State v. Ward*, 36 N.W. 765, 767 (Iowa 1888) (rejecting constitutional argument despite recognizing that the "officer in this case may have been guilty of a trespass").

This court thus explicitly considered and rejected the exclusionary rule for more than a century after Iowa's founding. *See State ex rel. Hanrahan v. Miller*, 98 N.W.2d 859, 860–61 (Iowa 1959); *State v. Smith*, 73 N.W.2d 189, 190 (Iowa 1955); *State ex rel. Kuble v. Bisignano*, 28 N.W.2d 504, 507–08 (Iowa 1947); *State v. Bradley*, 3 N.W.2d 133, 134–35 (Iowa 1942); *State v. Gillam*, 300 N.W.

567, 568 (Iowa 1941); *State v. Rowley*, 248 N.W. 340, 342–43 (Iowa 1933); *State v. Bourgeois*, 229 N.W. 231, 232 (Iowa 1930); *State v. Rollinger*, 225 N.W. 841, 841 (Iowa 1929); *State v. Bamsey*, 223 N.W. 873, 874 (Iowa 1929); *State v. Lambertti*, 215 N.W. 752, 753 (Iowa 1927); *State v. Korth*, 215 N.W. 706, 707 (Iowa 1927); *State v. Wenks*, 202 N.W. 753, 753 (Iowa 1925); *McNamara v. Utterback*, 200 N.W. 699, 700 (Iowa 1924); *Lucia v. Utterback*, 198 N.W. 626, 628 (Iowa 1924); *State v. Rowley*, 195 N.W. 881, 881–82 (Iowa 1923); *Foley v. Utterback*, 195 N.W. 721, 722 (Iowa 1923) (per curiam); *Joyner v. Utterback*, 195 N.W. 594, 596 (Iowa 1923). The rejection of the exclusionary rule did "not detract one iota from the full protection vouchsafed to the citizen by the constitutional provisions . . . [because a] trespassing officer [was] liable for all wrong done in an illegal search or seizure." *State v. Tonn*, 191 N.W. 530, 535 (Iowa 1923), *abrogated by State v. Hagen*, 137 N.W.2d 895 (Iowa 1965).

## C.

Contrary to the text of the constitution and the original precedents interpreting the same, this court ultimately adopted the exclusionary rule as a remedy for purported violations of article I, section 8 of the Iowa Constitution. *See Hagen*, 137 N.W.2d at 900. However, this court did so on belief that it was "compelled to do so by the United States Supreme Court's decision in *Mapp*." *State v. Cline*, 617 N.W.2d 277, 286–87 (Iowa 2000) (en banc), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601 (Iowa 2001). The "conclusion that *Mapp* required this court to adopt the exclusionary rule as a remedy for a

violation of state constitutional law was incorrect." *State v. Brown*, 930 N.W.2d 840, 862 (Iowa 2019) (McDonald, J., concurring specially).

While this court mistakenly believed that *Mapp* required states to adopt the exclusionary rule with respect to parallel provisions of their respective constitutions, the mistake was understandable. The Supreme Court was rapidly changing federal constitutional law and applying it to the states under the Fourteenth Amendment incorporation doctrine. *See* Henry J. Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 Cal. L. Rev. 929, 930 (1965) ("[A]lthough the Court has been inspired by the highest of motives, it ought to realize there is danger in moving too far too fast . . . ."). At the time, there was a belief that the Federal Constitution set the floor with respect to parallel provisions of state constitutions. In particular, as relevant here, there was a belief that states were required to adopt the exclusionary rule as a remedy for purported violations of their respective state constitutional search and seizure provisions. *See, e.g., State v. Lindquist*, 869 N.W.2d 863, 874 (Minn. 2015) ("The exclusionary rule has no basis in the U.S. and Minnesota Constitutions. Moreover, the exclusionary rule was wholly unknown as a remedy for unreasonable searches and seizures when our state constitution came into force in 1858, and was not adopted in Minnesota for over a century until the Supreme Court mandated its application to the states." (citations omitted)); *Commonwealth v. Russo*, 934 A.2d 1199, 1207 (Pa. 2007) ("Indeed, notwithstanding that the federal exclusionary rule had been in existence since the 1914 decision in *Weeks*, this Court . . . repeatedly refused to find a similar

remedy encompassed in Article I, Section 8. . . . The exclusionary rule itself, then, was not an organic part of Article I, Section 8; it was a federal imposition, made applicable against the states for Fourth Amendment purposes by *Mapp v. Ohio*." (citations omitted)).

Subsequent research and reflection have shown this floor-ceiling metaphor to be incorrect. "Incorporation did not change the substantive content of state constitutional law; it changed the substantive content of federal constitutional law." *Brown*, 930 N.W.2d at 858. "The Supreme Court's Fourteenth Amendment jurisprudence does not dictate the substance of the state law or the remedy for any violation of the same." *Id.* State courts were not compelled and are not compelled to continue to adhere to the federal exclusionary rule in interpreting a parallel provision of their respective state constitutions. *See Collins*, 138 S. Ct. at 1680 n.6 ("[T]he States are free to adopt their own exclusionary rules as a matter of state law. But nothing in the Federal Constitution requires them to do so."); *see, e.g., People v. Lance W.* (*In re Lance W.*), 694 P.2d 744, 752–53 (Cal. 1985) (en banc) (recognizing proposition repealed exclusionary rule for violations of California's constitutional prohibition against unreasonable searches and seizures). The states can "permissibly conclude that the benefits of excluding relevant evidence of criminal activity do not outweigh the costs when the police conduct at issue does not violate federal law." *California v. Greenwood*, 486 U.S. 35, 44–45 (1988). States are thus allowed to "eliminate the exclusionary rule as a remedy for violations" of state law. *Id.* at 44.

D.

Given the more recent research in this area and the understanding that this court is not bound to follow federal precedents interpreting the Fourth Amendment, this court should reconsider the state exclusionary rule under article I, section 8 of the Iowa Constitution in the appropriate case. *See* William J. Stuntz, *The Political Constitution of Criminal Justice*, 119 Harv. L. Rev. 780, 832 (2006) ("[T]he best thing to do with the massive body of Fourth Amendment privacy regulation, together with the equally massive body of law on the scope and limits of the exclusionary rule, is to wipe it off the books. Let states experiment with different regulatory regimes."). "[S]tare decisis does not prevent the court from reconsidering, repairing, correcting or abandoning past judicial announcements when error is manifest . . . ." *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 83 (Iowa 2022) (alteration and omission in original) (quoting *McElroy v. State*, 703 N.W.2d 385, 395 (Iowa 2005)). Error is manifest here. By ignoring the text of the constitution as it was understood at the time of its enactment and by ignoring the one hundred years of original precedents interpreting the same, modern search and seizure doctrine, including the exclusionary rule, has risen "into the thin atmosphere of sheer fiction." Robert H. Jackson, *The Struggle for Judicial Supremacy: A Study of a Crisis in American Power Politics* 292 (1941).

The nonfiction is the state constitution is silent on many matters. The Iowa Constitution creates a government. It sets forth the core powers of the government, divides the powers of the government among different departments,

and sets forth the outer bounds of the government's powers. It necessarily speaks in broad terms. It is inconceivable that the founders of our government believed the great charter of government directly regulated the conduct of every petty officer in every county, city, town, and village across the state and made every action of every government employee into a constitutional question. *C.f.* Davies, 98 Mich. L. Rev. at 663 ("Even so, there is no reason to think the Framers perceived an ordinary officer's misconduct to be a form of governmental action. Thus, they had neither a motive nor a basis for addressing the conduct of ordinary officers in constitutional provisions."). Indeed, this court explicitly rejected that interpretation of the constitution for more than a century after Iowa's founding despite repeated entreaties.

In accord with the text of the constitution and the original precedents interpreting and applying the same, we must admit the state constitution, as originally understood, has nothing intelligible to say about the minutiae of peace officer conduct and the admissibility of evidence in criminal proceedings depending upon how the peace officer obtained the evidence. How long can a roadside detention last? Can an officer manipulate a packet of foil in someone's pocket during a stop and frisk? Can the police collect discarded DNA for the purpose of determining identity? The constitution is silent on these questions. The contrary conclusion invites judges to write their own personal predilections and normative judgments into the constitution as caselaw. But that is not constitutional law; it is a legal fiction, and a dangerous one at that.

Because the exclusionary rule "is not constitutionally required, . . . [we] must rescind the exclusionary rule and leave it to the policy-making branches of government to develop policies to deter future police misconduct." Eugene Milhizer, *The Exclusionary Rule Lottery*, 39 U. Tol. L. Rev. 755, 767 (2008).

> Rescinding the exclusionary rule would afford the appropriate authorities the chance to fashion public policy based on moral values informed by practical experience. . . . It would unburden society from the consequences of an immoral and unwise rule, imposed by an illegitimate authority, designed to minimize one evil by threatening a different and often greater evil. We can and should do better than the current version of the exclusionary rule, and we would all be better for it if we did.

*Id.* at 767–68.

### III.

I join in full the court's well-reasoned opinion. For the reasons set forth in the court's opinion and the reasons set forth in this separate opinion, I conclude the defendant's conviction should be affirmed.

**OXLEY, Justice (dissenting).**

I cannot join the majority's Fourth Amendment analysis, which simplistically concludes that because Burns left behind his straw in a Pizza Ranch, he abandoned the information contained in his DNA embedded in the saliva left on the straw. Justice McDermott convincingly explains the problems with the majority's abandonment theory in parts II.A and II.B of his dissent. I agree with his analysis and repeat only his conclusions. First, extraction of information from DNA is a distinct act[12] from collecting the straw on which the DNA is left and must be analyzed separately. Second, the abandonment doctrine does not apply to DNA involuntarily and unavoidably shed in everyday life. And as Justice McDermott explains in part II.C, the majority's attempt to minimize the consequences of its reasoning is internally inconsistent. If abandonment of the straw means abandonment of the DNA—and the information contained in the DNA—then it matters not what the police do with any information extracted from that DNA.

Concluding that the DNA on the straw was not abandoned, however, only opens the inquiry. We must still apply United States Supreme Court precedent to determine whether the officers' processing of Burns's DNA was a search in the constitutional sense, and therefore entitled to Fourth Amendment protection. On

---

[12]Justice McDermott calls the DNA analysis a distinct "search." Where the DNA was not taken directly from Burns in the traditional sense of a search, whether the DNA analysis is a "search" is yet to be determined. It is, however, a distinct act from collecting the discarded straw, and with that qualification, I otherwise agree with Justice McDermott's analysis in parts II.A and II.B.

this issue, although I ultimately arrive at the same conclusion, I part ways with Justice McDermott's analysis in part I.B of his dissent. Under my interpretation of current Supreme Court precedent, Justice McDermott's attempt to categorize DNA as a "person" or "paper" so as to make its analysis a constitutional search is an unnecessary effort to fit a square peg into a round hole.

I believe *Carpenter v. United States*, 138 S. Ct. 2206 (2018), controls the Fourth Amendment analysis in this case. In *Carpenter*, the United States Supreme Court recognized that *Katz v. United States*, 389 U.S. 347 (1967), "*expanded* our conception of the [Fourth] Amendment to protect certain expectations of privacy as well" as the traditional property rights enumerated in the Amendment's text—"persons, houses, papers, and effects." *Carpenter*, 138 S. Ct. at 2213 (emphasis added) (quoting U.S. Const. amend. IV). Under that expanded view, the Fourth Amendment's protection applies essentially to anything ("something," in the Court's words) as long as someone " 'seeks to preserve [it] as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable.' " *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). If it is, "official *intrusion into that private sphere* generally qualifies as a search." *Id.* (emphasis added); *see also Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("It follows from our holding in *Silverman v. United States*, [365 U.S. 505 (1961)], that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' ").

Indeed, that the *Katz* test applies beyond the Fourth Amendment's textual limitation to "persons, houses, papers, and effects" is fully illustrated by *Carpenter* itself. There, the "something" at issue was "digital data," more specifically, "cell-site location information," or CSLI, about the person's physical movements, that was actually collected and owned by a third-party cellular service provider based on the person's use of a cell phone. *Carpenter*, 138 S. Ct. at 2211–12, 2214. Even though the information was actually *owned* by a third party and was merely *about* the person, the Supreme Court made no attempt to determine whether that information was that individual's person, house, paper, or effect. *See id.* at 2216–20. In doing so, the Supreme Court unmoored an individual's Fourth Amendment protections against unreasonable searches from the textual limitations in the Amendment. *See id.* at 2224 (Kennedy, J., dissenting) ("In concluding that the Government engaged in a search, the Court unhinges Fourth Amendment doctrine from the property-based concepts that have long grounded the analytic framework that pertains in these cases.").

Agree with that underlying premise or not, that is the precedent from the Supreme Court that should guide our analysis of Burns's Fourth Amendment challenge. The majority is correct that the Supreme Court described its decision as "a narrow one." *Id.* at 2220 (majority opinion). That means we should tread carefully in applying it, but it does not mean we can ignore it. Under *Katz* and *Carpenter*, we should be asking: (1) is the information contained in Burns's DNA something he sought to protect as private? And (2) is Burns's expectation of privacy in the information gathered from his DNA and used by officers an

expectation that society is prepared to recognize as reasonable? I agree with Justice McDermott that surreptitious collection of DNA is analogous to the third-party collection of the CSLI in *Carpenter*. But that only addresses the first part of the *Katz-Carpenter* test—whether Burns's DNA was something he sought to protect as private. We still must decide whether Burns's expectation is one society would recognize as reasonable.

As to the second part: The State argues, and the majority agrees, that using DNA to gather only identification information isn't really that invasive, as many courts have concluded. *See, e.g., People v. Mendez,* 155 N.Y.S.3d 534, 536–37 (Sup. Ct. 2021) ("[T]he extraction and analysis of DNA for the sole purpose of developing a profile is not, like the cell-cite location information at issue [in *Carpenter*], 'deeply revealing' or of substantial 'depth, breadth, and comprehensive reach,' since the genetic information obtainable from DNA that is deeply revealing and comprehensive is neither sought nor revealed in the process."). If we glean from *Carpenter* that the important distinction is the extent of information gathered, one could argue, as the *People v. Mendez* court found, that the limited use of DNA to only gather identifying information is minimal as compared to the extensive amount of information that could have been obtained from the DNA, a point the Supreme Court relied on in *Maryland v. King* to hold that analysis of an individual's DNA for identification purposes was not an unconstitutional search. 569 U.S. 435, 464 (2013) ("In addition the processing of respondent's DNA sample's 13 CODIS loci did not intrude on respondent's privacy in a way that would make his DNA identification unconstitutional."). But

that comparison is incomplete when *King* is considered more closely, and indeed, in light of *Carpenter*, is the wrong comparison.

To begin with, comparing the limited identification information actually collected to the wealth of information available, but not taken, from Burns's DNA is not the right comparison. Remember, we are determining whether the officers' actions—processing the DNA to collect unique identification information to use in a criminal investigation—violated an *expectation of privacy* society is prepared to recognize as reasonable. If we were assessing only whether *police conduct* was reasonable here, it is certainly important that officers only requested a report on whether Burns's DNA matched the blood sample from the crime scene—they did not request, or even receive, anything else. But in assessing whether individuals have a reasonable expectation that their DNA will remain private and not be tested without their consent or without a warrant, we should not blind ourselves to the vast scope of information police can gain access to when they "peek behind the curtain" of DNA.[13] Allowing the police's conduct to limit the scope of the allegedly protected privacy interest turns the Fourth Amendment analysis on its head.[14] *See Carpenter*, 138 S. Ct. at 2215 n.2 ("Justice Kennedy argues that this

---

[13]As amici American Civil Liberties Union and Electronic Frontier Foundation set out in their brief, that scope "includ[es] our propensities for certain medical conditions, such as Alzheimer's, cystic fibrosis, breast cancer, and addiction; our ancestry; and our biological familial relationships, which can reveal previously unknown parentage, among other things."

[14]If police invade the curtilage of a home, is it any less an invasion of an expectation of privacy in that curtilage if the police justify the act by saying they only wanted to get a better look into the open window that anyone passing by on the street could have looked through? *Cf. King*, 569 U.S. at 469 (Scalia, J., dissenting) ("And could the police engage, without any suspicion of wrongdoing, in a 'brief and . . . minimal' intrusion into the home of an arrestee—perhaps just peeking around the curtilage a bit? Obviously not." (alteration in original) (citation omitted)).

case is in a different category from *Jones* and the dragnet-type practices posited in *Knotts* because the disclosure of the cell-site records was subject to 'judicial authorization.' That line of argument conflates the threshold question whether a 'search' has occurred with the separate matter of whether the search was reasonable. The subpoena process set forth in the Stored Communications Act does not determine a target's expectation of privacy." (citation omitted)). Rather, we should first determine whether an expectation of privacy exists here and, if so, what it looks like, before we ask whether police "intrusion into *that* private sphere" qualifies as a search. *Id.* at 2213 (emphasis added).

For example, in *Carpenter*, it was not just that officials learned information from the third-party service provider about the individual's movements. Rather, the Court focused on the individual's "expectation of privacy in the record of his physical movements" over an extended period of time to determine whether the officers' use of the information was in fact a search. *Id.* at 2217. The Court thus began with the premise "that individuals have a reasonable expectation of privacy in the whole of their physical movements," before proceeding to determine whether "[a]llowing government access to cell-site records contravenes that expectation." *Id.* Only in then determining if the officers' use of the CSLI records "impinge[d] on expectations of privacy" did the Court analyze the extent of information gathered and the officers' use of that information. *Id.* at 2215, 2217–19 (quoting *United States v. Jones*, 565 U.S. 400, 430 (Alito, J., concurring in judgment) (2012)). To that end, the *Carpenter* Court compared *United States v. Knotts*, 460 U.S. 276 (1983), where it had concluded that intermittent tracking

of a planted beeper did not violate expectations of privacy because the travelling public can expect to be followed, with *United States v. Jones*, 565 U.S. 400, where five members of the Court agreed that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy," regardless of whether those movements were disclosed to the public at large. *Carpenter*, 138 S. Ct. at 2215–17 (quoting *Jones*, 565 U.S. at 430 (Alito, J., concurring in judgment)) (citing *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). From these cases, the Court concluded that use of the CSLI to track virtually all of Carpenter's physical movements over a period of seven days "invaded Carpenter's reasonable expectation of privacy." *Id.* at 2217–19. Therefore, only once we've determined whether an expectation of privacy exists here and what it looks like should we then look to the information received from Burns's DNA and how officers used it to analyze whether that use violated any reasonable expectation of privacy. At this threshold step, *King* is not only instructive, but, in my view, controlling.

The question in *King* was whether a Maryland statute, which allowed officers to collect DNA from arrestees of certain serious offenses to put into the CODIS database,[15] violated the Fourth Amendment where the DNA collection was unrelated to the charge of arrest and the arrestee had only been charged, not convicted. 569 U.S. at 443–46. The *King* majority went out of its way to first

---

[15]"CODIS is the acronym for the Combined DNA Index System and is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases." Fed. Bureau of Investigation, *Frequently Asked Questions on CODIS and NDIS*, https://www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy/codis-and-ndis-fact-sheet [https://perma.cc/JHR2-2ABE].

distinguish the lessened privacy expectations for an arrestee, explaining that while the

> Court has insisted on some purpose other than "to detect evidence of ordinary criminal wrongdoing" to justify these searches [of members of the general public] in the absence of individualized suspicion[,] . . . [o]nce an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, however, his or her expectations of privacy and freedom from police scrutiny are reduced.

*Id.* at 462–63 (citation omitted) (quoting *City of Indianapolis v. Edmund*, 531 U.S. 32, 38 (2000)) (noting that "special needs" were required to justify searching an average citizen in cases like *Chandler v. Miller*, 520 U.S. 305, 314 (1997), involving drug testing of a political candidate, and *Indianapolis v. Edmond*, 531 U.S. at 40–41, 47–48, involving police stops at a checkpoint). Yet even then, the Court still identified a noncriminal-investigation purpose for collecting and analyzing the arrestee's DNA. The Court concluded that "the context of a valid arrest supported by probable cause . . . gives rise to significant state interests in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody." *Id.* at 465. In other words, the majority said gathering DNA following an arrest was important to ensure that the officers knew who they had arrested for booking purposes and could accurately check his criminal history so they knew if he was dangerous for purposes of housing him in jail while he awaited trial.

Whether that justification is convincing or not (Justice Scalia certainly found it not to be, *see id.* at 466 (Scalia, J., dissenting) ("The Court's assertion

that DNA is being taken, not to solve crimes, but to *identify* those in the State's custody, taxes the credulity of the credulous.")), the relevant lesson from *King* is that even the majority recognized that the Fourth Amendment protects against a person's DNA being used to match that person to a general criminal investigation; the DNA analysis there was permissible only because it was being used for identification purposes in the booking process of an arrestee. *See id.* at 449, 460–63 (majority opinion). If an arrestee—whose expectations of privacy are already diminished—is still protected against use of identification information from his DNA for general criminal investigation purposes unrelated to the offense of his arrest, how can we say an unsuspecting member of the general public is not? The lengths to which the *King* majority went to justify using the arrestee's DNA for a purpose other than criminal investigation solidifies this point. The expectation that police will not warrantlessly analyze an individual's DNA is one that society is prepared to recognize as reasonable—at least where, as here, that person does not have a diminished expectation of privacy from already being in police custody.

Now we must analyze whether the actual intrusion police made into Burns's expectation of privacy here was constitutionally significant. Again, *King* is controlling. Analyzing King's DNA was constitutionally sound only because police had a noncriminal-investigation use for the DNA—identifying him for booking purposes and determining whether he might be dangerous while detaining him by ensuring the officers knew his criminal history. *See id.* at 450–53. Here, even though officers only received relatively minimal information from

the lab report about Burns, it is the specific information they received that matters. And here, the DNA information they received revealed that Burns was a match to the major contributor of DNA in the Martinko investigation[16]—critical information they could not have otherwise obtained. When police used sophisticated technology to obtain unique identifying information from Burns's DNA to compare it to the unidentified blood left in Martinko's car all those years ago, *Carpenter*, read in light of *King*, says they intruded into Burns's private sphere, making that a search under the Fourth Amendment that required a warrant. *Cf. Carpenter*, 138 S. Ct. at 2213 ("[O]fficial intrusion into that private sphere [(i.e., intrusion upon a reasonable expectation of privacy)] generally qualifies as a search and requires a warrant supported by probable cause.").

Indeed, once you strip away the technological aspects of this action, not only does it begin to look like what we would traditionally classify as a "search" (e.g., reading through someone's "papers" to determine where they were and what they did on a specific date), but it in fact looks like precisely the type of generalized, suspicionless search that the Framers sought to guard against. If the Fourth Amendment has nothing to say on this matter, there is no reason police could not have done the same thing to everyone in the Pizza Ranch, or

---

[16]The majority is correct that the lab report confirmed only that Burns's DNA revealed that he was male and "could NOT be eliminated as the major contributor to the DNA profile previously developed from" the Martinko crime scene. But the officer's affidavit to support the subsequent search warrant for a buccal swab from Burns to create a complete DNA profile explained that the officer "spoke with the analyst who explained that this finding mean[t] that the DNA collected from a drinking straw used by Jerry Burns was found [to] be a match for our suspect sample by the DCI Crime Lab." So the "could NOT be eliminated" language from the lab report is not as innocuous as it might appear.

everyone who lived in Cedar Rapids in 1979, or everyone, period. As Justice McDermott states in his dissent, "If we have no legitimate expectation of privacy in the 'bread-crumb trail of identifying DNA matter' we leave behind, 'what possible impediment can there be to having the government collect what we leave behind, extract its DNA signature and enhance CODIS' . . . 'to include everyone?' " (Quoting *United States v. Kincade*, 379 F.3d 813, 873 (9th Cir. 2004) (Kozinski, J., dissenting).) The lengths to which the majority in *King* went to find a justification for collecting King's DNA reveals otherwise.

That is not to say DNA is off-limits to police investigations. The warrant application affidavit ultimately used to properly obtain Burns's DNA reveals the impressive techniques officers used to crack this cold case. Through genealogy databases and cooperating individuals identified through that process, officers narrowed the suspects down to Burns and his two brothers. The problem arose when officers searched Burns's DNA without a warrant.

While my underlying analysis differs from Justice McDermott's in part I.B of his dissent, rather than reiterate the additional points he persuasively makes, I join the remainder of his opinion.

**McDERMOTT, Justice (dissenting).**

The majority's holding hinges on the idea that the drinking straw and the DNA specimen on it were "abandoned property," and since people have no reasonable expectation of privacy in abandoned property, the Fourth Amendment is not even implicated here. But to call microscopic strands of DNA in human cells that we involuntarily leave wherever we go "abandoned" doesn't fit either a common or legal conception. The majority's attempt to buttress its holding with a false analogy between fingerprints and DNA, and an empty limitation that permits DNA analysis only for identification purposes, serves to highlight—not abate—the majority opinion's weaknesses. Because the warrantless search of the DNA specimen in this case violated Jerry Burns's Fourth Amendment protections against unreasonable searches and seizures, I respectfully dissent.

## I. The Constitution.

### A. Text and Technology.

The Fourth Amendment to the United States Constitution doesn't lay down an aspiration or suggestion. It embodies a protection as powerful and firmly-held as any other in the Bill of Rights. The limitations that it imposes on the government, informed by the Framers' lived history of abuse and subjection under a system of general warrants and writs of assistance, are "not mere second-class rights but belong in the catalog of indispensable freedoms." *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting).

Contempt for unrestrained searches for evidence of criminal activity was "one of the driving forces" that sparked the American Revolution itself. *Riley v. California*, 573 U.S. 373, 403 (2014). As Justice Robert Jackson warned, "Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar*, 338 U.S. at 180.

The Fourth Amendment states in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The amendment presents one long sentence with two parts. The text of the first part divides into four questions: (1) Is the subject of the alleged intrusion a person, house, paper, or effect? (2) If so, was it searched or seized? (3) If so, was it the defendant's ("their") person, house, paper, or effect? (4) If so, was the search or seizure unreasonable? Orin S. Kerr, Katz *as Originalism*, 71 Duke L.J. 1047, 1052 (2022) [hereinafter Kerr, Katz *as Originalism*].

The parties do not parse the text of the Fourth Amendment but focus instead on the familiar "reasonable expectation of privacy" test that derives from Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring). Under the *Katz* test, the government action is a search if it violates an actual (subjective) expectation of privacy and society is prepared to recognize that expectation as objectively reasonable. *Id.* at 361. The

United States Supreme Court, in the decades since *Katz,* has often used this two-step test to determine whether a Fourth Amendment search has occurred. *See, e.g., Carpenter v. United States,* 138 S. Ct. 2206, 2213 (2018); *Smith v. Maryland,* 442 U.S. 735, 740 (1979). The *Katz* test has been described "as a means of identifying modern equivalents to the physical-entry invasions that occurred in 1791," and thus a way "to ensure technology-neutrality in the Fourth Amendment's coverage of what is a search." Kerr, Katz *as Originalism,* 71 Duke L.J. at 1050.

The majority finds that Burns fails both parts of the *Katz* test. First, the majority finds that Burns made no effort to preserve the drinking straw or the DNA on it, and thus "could hardly have retained any subjective expectation of privacy in the straw." Second, even if Burns had a subjective expectation of privacy in the straw or his DNA specimen, the majority finds that it wasn't a reasonable expectation because he abandoned the straw and the law generally permits no reasonable expectation of privacy in abandoned property.

In analyzing these issues, we must distinguish between the drinking straw and the DNA specimen on the straw. A straw, of course, is a hollow tube (typically plastic) commonly provided to diners to facilitate drinking. A DNA specimen, conversely, is a molecule found within the nucleus of a cell that carries the genetic instructions for a particular person's entire biological development and function. A straw and a DNA specimen are capable of physical separation—a fact made obvious in this case by the DNA specimen's extraction from the straw for analysis. The straw itself was of no investigatory use separate from Burns's DNA

specimen. Thus the pertinent questions in this case surround whether the DNA specimen, not the straw, was protected from a warrantless search.

Burns raises his unlawful-search challenge under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. We independently interpret Iowa constitutional provisions even when the Federal Constitution contains nearly identical language. *State v. Wright*, 961 N.W.2d 396, 402–03 (Iowa 2021). Because Burns's challenge under the Federal Constitution resolves this appeal, I focus only on the Fourth Amendment claim and forego separate analysis under the Iowa Constitution.

### B. Analysis of the Text.

Whether an expectation of privacy is one that "society is prepared to recognize as 'reasonable,' " as the *Katz* test asks, necessarily brings us back to the Fourth Amendment's text. 389 U.S. at 361. The protection only applies to a "person," "house," "paper," or "effect" under the Fourth Amendment. U.S. Const. amend. IV. Which of these categories, if any, does a DNA specimen fall under? No Supreme Court case to date directly addresses this question.

But we know that these categories must bear the same meaning—to have all the same dimensions and coverage—that they had when the Fourth Amendment was enacted. *Kyllo v. United States*, 533 U.S. 27, 34 (2001) (per Scalia, J.). We're required, in other words, to apply the Constitution to current circumstances even when, as in this case, technological change presents a circumstance that people living when the Fourth Amendment was enacted

wouldn't fathom.[17] Interpreting the words in this way "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter,* 138 S. Ct. at 2214 (alteration in original) (quoting *Kyllo,* 533 U.S. at 34). As originalist scholar William Baude explains:

> At a most basic level, it does not take any fancy theoretical footwork to see that fixed texts can harness what seem to be changing meanings. Though the text may have originally been expected to apply in a particular way to a particular circumstance, that does not mean that its original meaning always must apply in the same way. Similarly, originalists can sensibly apply legal texts to circumstances unforeseeable at the time of enactment. This is because a word can have a fixed abstract meaning even if the specific facts that meaning points to change over time.

William Baude, *Is Originalism Our Law?,* 115 Colum. L. Rev. 2349, 2356 (2015). To give an example, the noun "shields" could encompass a meaning that includes both a medieval piece of personal armor, or a futuristic technology that protects a starship. In searching for meaning, we focus on the function and not any particular form.

1. *"Person."* Human genetic material created by and within a person—matter that, though microscopic, once formed a body part—certainly bears strong connection to a "person." Each of us has a meter of DNA "packed into every cell, and so many cells that if you formed all the DNA in your body into a single strand, it would stretch ten billion miles, to beyond Pluto. Think of it: there

---

[17]DNA was still scores of years from its discovery when the Bill of Rights was ratified. Even as late as the 1930s, the idea that you could pluck a gene and the DNA that composed it "from your body and take it away for study was as absurd to many [scientists] as the idea that scientists today might capture a stray thought and examine it under a microscope." Bill Bryson, *A Short History of Nearly Everything* 402 (2003).

is enough of you to leave the solar system. You are in the most literal sense cosmic." Bill Bryson, *The Body* 5 (2019) [hereinafter Bryson, *The Body*].

The Supreme Court's treatment of blood in its cases is illuminating. In *Birchfield v. North Dakota,* the Court determined that using a person's breath for a warrantless alcohol test in a drunk driving investigation didn't violate the Fourth Amendment. 579 U.S. 438, 479–79 (2016). Testing exhaled air for its alcohol concentration, the Court reasoned, involves no meaningful physical intrusion and is only a "negligible" invasion of privacy. *Id.* at 461. But *blood* tests are "a different matter," the Court further reasoned, because they " 'require piercing the skin' and extract a part of the subject's body." *Id.* at 463 (quoting *Skinner v. North Dakota,* 489 U.S. 438, 625 (2016)). Perhaps with a direct nod to DNA evidence, the Court noted that expelled air used in a preliminary breath test was not a specimen "from which a wealth of additional, highly personal information could potentially be obtained." *Id.* A DNA specimen, of course, is.

The more analogous case might be *Kyllo v. United States*, in which a federal agent, while parked in his vehicle on the street, used thermal imaging technology to measure heat emanating from inside a home to investigate whether the homeowner was growing marijuana. 533 U.S. at 29–30. The Court held that the thermal imaging was a search under the Fourth Amendment because it gave the government private information that otherwise would have required a physical invasion of the home. *Id.* at 34, 40. The holding in *Kyllo* demonstrates that Fourth Amendment searches can occur without any physical intrusion. *See* Kerr, Katz *as Originalism,* 71 Duke L.J. at 1054 (citing the holding in *Katz*). In this

case, similar to *Kyllo,* the extraction and analysis of Burns's DNA provided the State private information that otherwise would have required a physical invasion of Burns's person.

2. *"Papers."* The nature of the information revealed in a DNA specimen also suggests a fit within the meaning of a "paper." DNA carries a person's private genetic information, identical in material respects to the types of sensitive information generally protected in one's "papers." It's not a "paper" in the form that someone in 1791 would have recognized it, of course; but then again, neither is electronic information stored on a computer hard drive or smartphone. *See Riley*, 573 U.S. at 403.

Phones and computers use a skeuomorphic design—a digital interface in which electronic elements resemble real-world objects, such as a "document," or "file folder," or "trash bin." In reality, the digital device simply stores a series of ones and zeroes; everyone knows there are no physical documents, folders, or trash bins found within. But information stored in digital form, based on its use and function, nonetheless warrants Fourth Amendment protection as "papers." *See, e.g., United States v. Warshak,* 631 F.3d 266, 285–86 (6th Cir. 2010) ("Given the fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection. Email is the technological scion of tangible mail." (citations omitted)).

It stands to reason that if a string of binary digits encoded onto a miniscule spinning magnetic disk to record private information is a "paper," then a string

of DNA codons stored in the nucleus of human cells could similarly be considered a "paper." The information encoded in our DNA ranges from biological familial relationships and ancestral origins to our predisposition to suffering from certain genetically-determined diseases. Researchers have linked DNA to our behavioral traits, our preferences and aversions, and our physical appearance. Given the intensely private nature of the information, an actual printout of someone's DNA analysis could certainly constitute "papers" protected under the Fourth Amendment. There's no reason it should lack similar protection as a "paper" in its molecular form.

The Supreme Court's holding in *Skinner v. Railway Labor Executives' Assoc.*, a case addressing the Fourth Amendment's application to a law mandating employee blood testing, generally supports the notion that a DNA specimen could constitute a "person" or "paper." 489 U.S. 602, 617–18. Although the opinion doesn't include discussion parsing the particular categories listed in the Fourth Amendment's text, the Court nonetheless concluded that "collection and subsequent analysis of . . . biological samples must be deemed Fourth Amendment searches." *Id.* at 618.

There's perhaps some overlap between "person" and "papers" in play here. Other cases applying the Fourth Amendment to new technologies suggest some category straddling at work. This seems permissible considering that the Fourth Amendment's list ("persons, houses, papers, and effects") is joined by the inclusive connector "and." U.S. Const. amend. IV. In *Katz*, for instance, the Court found a Fourth Amendment violation when the FBI installed a hidden

microphone to record conversations in a public phone booth. *Katz,* 389 U.S. at 348–49, 359 (majority opinion). Neither the majority opinion nor Justice Harlan's concurrence specified whether the Fourth Amendment applied because the phone booth was a type of "house" or "effect." *See id.* at 347; Kerr, Katz *as Originalism,* 71 Duke L.J. at 1054. Spoken words don't neatly fall into the categories of "papers" or "effects," but the Court has said that conversations heard through wireless eavesdropping nonetheless constitute unlawful seizures. *See Wong Sun v. United States,* 371 U.S. 471, 485 (1963) (citing *Silverman v. United States,* 365 U.S. 505 (1961)).

Similarly, although the postal system is obviously not a house, the Supreme Court long ago held that a piece of mail in a sealed envelope was entitled to house-like protection. *Ex parte Jackson,* 96 U.S. 727, 732–33 (1877); *see* Kerr, Katz *as Originalism,* 71 Duke L.J. at 1082. "Whilst in the mail," sealed letters are afforded the same protection against searches as "papers [that] are subjected to search in one's own household." *Jackson,* 96 U.S. at 733.

## II. The Majority's Abandonment Holding Is Wrong.

### A. The "abandonment" doctrine does not apply to the DNA specimen on the straw.

In this case, the State didn't get a warrant before it seized the straw and extracted and analyzed the DNA specimen on it. The State makes no claim that any exception to the warrant requirement applies. Instead, the State argues— and the majority holds—that people have no constitutional search-and-seizure protections in property they abandon and, thus, that the Fourth Amendment has no application in this case because Burns abandoned the straw and the DNA

specimen on it. The majority finds, in other words, that by abandoning the straw Burns cannot establish that the straw or the DNA specimen on it was *his* person, house, paper, or effect.

The majority's conclusion relies on a false premise. Even if we accept that Burns abandoned the straw, this does not mean that he also abandoned his DNA specimen on the straw. And as a result, the State could not extract and search the DNA specimen without a warrant.

There are two reasons for this. First, the extraction and analysis of Burns's DNA is a search separate and apart from the seizure of the straw, with distinct Fourth Amendment considerations that go with it. There's a fundamental difference between seizing an object and extracting private information contained on or within that object. Fourth Amendment interests are invaded by depriving a person of the right to exclude others from *information*. People have the right, in other words, "to be secure" in their person and papers, as opposed to simply the right not to be deprived of their person or papers. U.S. Const., amend. IV.

In *Riley v. California*, the Supreme Court unanimously held that even though police could lawfully *seize* a person's cell phone incident to the person's arrest, police generally could not *search* the digital information stored on the cell phone. 573 U.S. at 403. "Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple— get a warrant." *Id.* The Court's holding rested on clear lines of distinction it drew between cell phones as "physical objects," on the one hand, and "data stored *on* a cell phone," on the other. *Id.* at 386–87 (emphasis added). The Court recognized

the strong privacy interests at stake because people's cell phones contain "a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at 395. Applying the same principle in this case, even if we accept that the police may lawfully seize a used drinking straw, police cannot parlay that right into a right to search the DNA on it.

Second, the doctrine of abandonment doesn't apply to DNA that a person involuntarily and unavoidably sheds in the course of daily life. The abandoned property doctrine hinges on whether a person "voluntarily" abandons the thing in question. *State v. Bumpus*, 459 N.W.2d 619, 625 (Iowa 1990). "Under Iowa law, '[a]bandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property.' " *Wright*, 961 N.W.2d at 415 (alteration in original) (quoting *Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995) (en banc)). Determining "whether a person has voluntarily abandoned property" is thus a question of intent, and intent "may be inferred from words, acts, and other objective facts." *Bumpus*, 459 N.W.2d at 625; *see also Abel v. United States*, 362 U.S. 217, 239 (1960) (explaining that a warrantless seizure of items was permitted only because the suspect "*chose* to leave some things behind in his [hotel] room, which he *voluntarily* relinquished" (emphasis added)).

The Supreme Court's holding in *Carpenter v. United States* illuminates how involuntary disclosure plays into the reasonable expectation of privacy analysis. 138 S. Ct. 2206. In *Carpenter*, the Court rejected the notion that people voluntarily expose their cell phone location information and thus have no Fourth

Amendment protection in location data collected by cell phone companies. *Id.* at 2220. The location information, the Court reasoned, "is not truly 'shared' as one normally understands the term." *Id.*

The reasons are interconnected. First, "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Id.* (quoting *Riley*, 573 U.S. at 385). This "indispensability" principle holds truer still, of course, with the omnipresence of human DNA. Every human cell contains a copy of our DNA. Our physical participation in society—social presence itself—requires us to bring our DNA to public spaces.

The Court's second reason is rooted in the automatic nature of the disclosure. In the case of a cell phone, the device "logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* Disclosure of location information to the cell phone company arises from "[v]irtually any activity on the phone," including various automated phone operations. *Id.* The Court noted that, short of "disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data." *Id.*

The automatic-disclosure principle discussed in *Carpenter* applies with even more force to DNA evidence. A DNA specimen can come from the shedding of any human cells—skin, blood, saliva, sweat, hair, and on and on. DNA is released when someone sneezes, speaks, or touches something. The natural release of a person's DNA into their environment—skin cells left by resting an

elbow on an armchair,[18] an eyelash lost with a blink,[19] a droplet of sweat on a bicycle handle,[20] a trace of saliva on a drinking straw,[21] and so on—doesn't have the element of *voluntary* relinquishment necessary for an act to constitute abandonment. *See* Elizabeth E. Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment And Genetic Privacy*, 100 Nw. U. L. Rev. 857, 867 (2006) (explaining how, with involuntarily shed DNA, "[t]he volition that is implied in abandonment is simply unrealistic").

DNA, like cell phone data, is left "without any affirmative act" of the person. *Carpenter*, 138 S. Ct. at 2220. Indeed, as long as one lives, "there is no way to avoid leaving behind a trail of" DNA in the places and spaces that a person inhabits. *Id.* A human can turn off a cell phone; a human cannot turn off one's own automatic, continuous life cycle of creating and casting off DNA. If we possess a reasonable expectation of privacy in sensitive digital information that we unavoidably leave behind, we likewise possess a reasonable expectation of privacy in the sensitive genetic information we unavoidably leave behind.

**B. By leaving the straw, Burns did not "assume the risk" of abandoning his DNA for the government's criminal investigation.**

Nor can we conclude that a person lacks a reasonable expectation of privacy in shed DNA under an "assumption of risk" theory. The Court in

---

[18]Expert testimony in this case indicates that the average human sheds approximately two million skin cells *per minute*.

[19]You blink about 14,000 times a day. Bill Bryson, *The Body* 4.

[20]"Even at rest we sweat steadily, if inconspicuously, but if you add in vigorous activity and challenging conditions, we drain off our water supplies very quickly." *Id.* at 23.

[21]A typical adult secretes a little less than a quart and a half of saliva a day. *Id.* at 98.

*Carpenter*, having already observed the cell phone's indispensability to modern life, determined that "in no meaningful sense does the user voluntarily 'assume[] the risk' of turning over a comprehensive dossier of his physical movements" to others. *Id.* (alteration in original) (quoting *Smith*, 442 U.S. at 745). What's true in *Carpenter* is truer here: "in no meaningful sense" do people "voluntarily 'assume[] the risk' of turning over a comprehensive dossier" of sensitive biological information simply through the involuntary shedding of DNA. *Id.* (alteration in original) (quoting *Smith*, 442 U.S. at 745).

Justice Gorsuch's dissent in *Carpenter* examined the limitations of an assumption-of-risk theory when someone reveals private information to third parties knowing there's a possibility that the third party could reveal it. *Id.* at 2262–63 (Gorsuch, J., dissenting). He distinguished *knowledge* of a possibility that information could be revealed from *legal responsibility* for its revelation. *Id.* at 2263. "[K]nowing about a risk doesn't mean you assume responsibility for it." *Id.*

On this point, Professor Richard Epstein (in an article cited in Justice Gorsuch's dissent) warns that we must "guard against the undue extension of the notion of voluntary consent" in Fourth Amendment cases through "the false equation of knowledge of a risk with the assumption of the risk." Richard A. Epstein, *Privacy and the Third Hand: Lessons from the Common Law of Reasonable Expectations*, 24 Berkeley Tech. L.J. 1199, 1204 (2009) [hereinafter Epstein]. "Whenever you walk down the sidewalk you know a car may negligently or recklessly veer off and hit you, but that hardly means you accept the

consequences and absolve the driver of any damage he may do to you." *Carpenter*, 138 S. Ct. at 2263 (citing Epstein, 24 Berkeley Tech. L.J. at 1204). "The requirement of waiver is critical," Epstein explains, "because it suggests that there is some quid pro quo in the relationship. Knowledge in the absence of consent precludes that possibility, because all the gain goes on one side and all the costs go on the other." Epstein, 24 Berkeley Tech. L.J. at 1204.

Short of some hermitic existence in which a person somehow never leaves the confines of home, there's no reliable way to protect against exposing your DNA to the government. Participating in life (setting aside, I suppose, some virtual reality sphere) is pretty much impossible without exposing yourself to the risk that the government could collect and analyze your DNA as you unavoidably and unconsciously discard it. The trap is always set and inescapable. Walking into the trap happens autonomically and at the microscopic level, in such a way that we come to it with a lowered guard and leading chin. The Supreme Court has cautioned us to be wary of the "power of technology to shrink the realm of guaranteed privacy." *Kyllo*, 533 U.S. at 34. By declaring involuntary shedding of our DNA "abandonment," the majority ushers the way for an unconstitutional constriction of privacy rights.

### C. The majority's claim that analyzing Burns's DNA was constitutional because it was limited to identification cannot be reconciled with the majority's other analysis.

The majority determines that using DNA only for identification purposes, as the police did in this case, doesn't "foreclose the possibility that *other* kinds of warrantless DNA analysis might require a different result." The majority seeks

to present its holding as a wooden matchstick, good for one light only. But in so doing, the majority fails to own up to the consequence of its own reasoning and instead "disguises the vast (and scary) scope of its holding by promising a limitation it cannot deliver." *Maryland v. King*, 569 U.S. 435, 481 (2013) (Scalia, J., dissenting).

Today's decision commits to a governing principle with unconstitutional moorings that the majority itself appears unable to reconcile. It can't square an identity-only limitation on DNA analysis with its own earlier holding that the constitution doesn't protect abandoned DNA *at all.* Again, the majority's holding is premised on the notion that Burns had no reasonable expectation of privacy in his DNA specimen on the straw. And without a reasonable expectation of privacy, there is no "search" for Fourth Amendment purposes. "Trash is trash," after all, as the State repeatedly said at oral argument.

Either the DNA is abandoned, or it isn't. The majority makes clear that "just as Burns voluntarily abandoned the straw, he also voluntarily abandoned any DNA attached to the straw" and thus " 'could have had no reasonable expectation of privacy' in either." (Quoting *California v. Greenwood*, 486 U.S. 35, 40–41 (1988).) The conditional proposition the majority lays down—if DNA is abandoned, then police may do with it as they wish without Fourth Amendment imposition—offers no room for a different result in a future case involving abandoned DNA. The majority's reasoning burns the ship after disembarking. "The line it is drawn. The curse it is cast." Bob Dylan, *The Times They Are A-Changin'* (Warner Bros., Inc. 1963). The suggestion that in the future we might

decide other challenges to warrantless DNA analysis differently is empty consolation.

### III. The False Analogy Between DNA and Fingerprints.

Much of the majority's holding hinges on our acceptance that DNA is more or less analogous to a fingerprint. In his stinging dissent in *Maryland v. King*—the same case today's majority cites for its fingerprint-to-DNA analogy—Justice Scalia responded to the analogy this way: "[T]he Court's comparison of Maryland's DNA searches to other techniques, such as fingerprinting, can seem apt only to those who know no more than today's opinion has chosen to tell them about how those DNA searches actually work." 569 U.S. at 466.

A fingerprint reveals—with existing technology, at least—only identity, and reveals *that* only by comparing one fingerprint against a known sample. A fingerprint itself stores no private information. To the extent a fingerprint has any communicative application at all, it derives merely from the fact of its existence ("someone was here") or from comparing it to another known fingerprint exemplar ("Brooks was here").

DNA, on the other hand, arms those with the ability to analyze it with a vast trove of private details about a person. The informational superabundance of DNA and its ever-expanding uses have sparked a scientific revolution. No less than a dozen Nobel Prizes have been awarded for research involving DNA.[22] DNA

---

[22] *See* Helix, *The Nobel Prize: Winners Who've Advanced the Study of Genetics*, https://blog.helix.com/2017/10/nobel-prize-winners-genetics/ [https://perma.cc/FAD8-SNUZ]; The Nobel Prize, *All Nobel Prizes*, https://www.nobelprize.org/prizes/lists/all-nobel-prizes/ [https://perma.cc/MM9Z-3Y5N].

has been called "the most extraordinary molecule on Earth." Bill Bryson, *A Short History of Nearly Everything* 399 (2003). It is considered among history's greatest scientific breakthroughs. Gareth Williams, *Unraveling the Double Helix* 203 (2019). DNA has not received these accolades because of its mere capacity to verify identity against an exemplar.

The reasonable expectation of privacy test applied in *Carpenter* "focuse[d] on how much the government can learn about a person regardless of the place or thing from which the information came." Orin S. Kerr, *Implementing* Carpenter, *in The Digital Fourth Amendment* 6 (USC L. Legal Stud. Working Paper No. 18–29, (Oxford Univ. Press, forthcoming)). People do not forfeit to the government a reasonable expectation of privacy in the contents of their entire genetic code—and all that it reveals about them—merely by leaving a drinking straw at a restaurant.

DNA is that much richer, that much more laden with information, by orders of magnitude, than fingerprints. And DNA is that much more sensitive to privacy concerns than fingerprint impressions left on a surface. Like fingerprints, the analogy exists on the surface only. The comparison between fingerprints and DNA denotes, it seems to me, rationalization rather than reasoning.

### IV. The Crime-Solving Potential of Warrantless DNA Searches Does Not Trump Our Fourth Amendment Protections.

The majority suggests that we should expect and even welcome the benefits of warrantless DNA analysis because of "DNA testing's 'unparalleled ability both to exonerate the wrongly convicted and to identify the guilty' " and its "potential to significantly improve both the criminal justice system and police

investigative practices." (Quoting *King*, 569 U.S. at 442 (majority opinion).) You can count me among those dazzled by the crime-solving capabilities of DNA analysis. If the constitutional test for an investigation technique turned on that technique's capacity to aid the government in solving crimes, DNA analysis would doubtless sail past the bar with such vertical velocity as to escape Earth's gravity.

Yet the mere capacity to enable easier or faster crime detection does not—and cannot—determine whether an action violates constitutional safeguards. "Solving unsolved crimes is a noble objective," in the words of Justice Scalia, "but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches. The Fourth Amendment must prevail." *King*, 569 U.S. at 481 (Scalia, J., dissenting).

The Supreme Court has declared many warrantless investigatory practices unconstitutional notwithstanding a particular technique's formidable potency for crime-solving. *See, e.g., Carpenter*, 138 S. Ct. at 2220–21 (majority opinion) (cell phone location data); *United States v. Jones*, 565 U.S. 400, 410 (2012) (GPS tracking device on a vehicle); *Kyllo*, 533 U.S. at 40 (heat-sensing technology aimed at a home). Warrantless entry by kicking in the doors of homes might well result in solving more crimes, but that doesn't mean the Fourth Amendment sanctions it. *See Florida v. Jardines*, 569 U.S. 1, 11–12 (2013) (finding even the government's use of trained police dogs to sniff the immediate surroundings of a home constitutes a "search" within the meaning of the Fourth Amendment).

Courts have no license to aid the government in solving crimes through judicial revision of constitutional protections.

Justice Brandeis's warning about state action is well heeded here: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent." *Olmstead v. United States*, 277 U.S. 438, 479, (1928) (Brandeis, J., dissenting) (*overruled by Katz*, 389 U.S. 347, *and Berger v. New York*, 388 U.S. 41 (1967)). The potential power to assemble a DNA database of all Americans using "abandoned" DNA (in which the majority says you have no rights) to "improve both the criminal justice system and police investigative practices" should bring a shudder to the reader. (Quoting *King*, 569 U.S. at 442 (majority opinion).) If we have no legitimate expectation of privacy in the "bread-crumb trail of identifying DNA matter" we leave behind, "what possible impediment can there be to having the government collect what we leave behind, extract its DNA signature and enhance CODIS"—the national repository of criminal offenders' DNA profiles—"to include everyone?" *United States v. Kincade*, 379 F.3d 813, 873 (9th Cir. 2004) (Kozinski, J. dissenting).

"[P]laced in the hands of an administration that chooses to 'exalt order at the cost of liberty,' *Whitney v. California*, 274 U.S. 357, 374 (1927) (Brandeis, J. dissenting), the database could be used to repress dissent or, quite literally, to eliminate political opposition." *Id.* at 847 (Reinhardt, J., dissenting). Searching the database for behavioral or psychological markers conceivably becomes a means to generate criminal suspects by identifying people with, for instance, predispositions to aggressive behavior or mental health disorders. On the whole,

I much prefer Thomas Jefferson's approach: "The time to guard against corruption and tyranny, is before they shall have gotten hold on us. It is better to keep the wolf out of the fold, than to trust to drawing his teeth and talons after he shall have entered." Thomas Jefferson, Notes on Virginia (1787), *in Notes on the State of Virginia* 125 (Boston, Lilly and Wait, 1832).

The majority's attempt to analogize a rapist's DNA left at a crime scene and abandoned DNA left on a straw at a pizza restaurant confuses the analysis. A warrant to gather and analyze crime-scene evidence is uncontroversial. The government is permitted to use DNA evidence to solve crimes; the constitutional violation in this case involves only the *warrantless* collection and analysis of Burns's DNA. DNA evidence remains available to use in criminal investigations with a warrant supported by probable cause. No party suggests that obtaining a warrant to gather and analyze DNA left at a crime scene poses an unreasonable burden on law enforcement.

As explained in *Entick v. Carrington*—a case " 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted," *Jones*, 565 U.S. at 405 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 598 (1989))— even for "murder, rape, robbery, and housebreaking . . . our law has provided no paper search in these cases to help forward the convictions." *Entick*, (1765) 19 How. St. Tr. 1029, 1073 (C.P.). We should not let DNA's efficacy override core constitutional protections.

**V. The Benefit of the Law.**

I recognize that had my view prevailed today, Burns's murder conviction would be reversed, and the prosecution would be left to pursue a conviction in a new trial without the same DNA evidence. But that is the very essence of how the exclusionary rule operates, and no party in this case asks us to cast the rule aside. Courts cannot carry out their duty to uphold constitutional rights only when doing so will mean the reversal of misdemeanor convictions. Warrantless searches of DNA should not be permitted simply because we've decided that the cost of enforcing the Fourth Amendment's promise is too high.

Even murder suspects receive the benefit of constitutional protections. Law enforcement has no license to suspend these protections to get its man, even to solve a crime as heinous as the one in this case. The lines ascribed to Sir Thomas More and William Roper by the playwright Robert Bolt are not without relevance here:

> Roper[:] So now you'd give the Devil the benefit of the law!
>
> More[:] Yes. What would you do? Cut a great road through the law to get after the Devil?
>
> Roper[:] I'd cut down every law in England to do that!
>
> More[:] Oh? And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake.

Robert Bolt, *A Man For All Seasons: A Play in Two Acts* 66 (1990) (stage directions omitted).

The Fourth Amendment protects "that degree of respect for the privacy of persons and the inviolability of their property that existed when the provision was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusion 'reasonable.'" *Minnesota v. Dickerson*, 508 U.S. 366, 380 (1993) (Scalia, J., concurring). We can anticipate, in light of today's ruling, that the public will come to accept that they have no reasonable expectation of privacy in DNA that they involuntarily and unavoidably leave behind. As Judge Kozinski warned in his dissent about the perils of government DNA collection, a court opinion that "revels in the boon that new technology will provide to law enforcement[] is an engraved invitation to future expansion. And when that inevitable expansion comes, we will look to the regime we approved today as the new baseline and say, this too must be OK because it's just one small step beyond the last thing we approved." *Kinkade*, 379 F.3d at 873 (Kozinski, J., dissenting).

Today's opinion might not bring Fourth Amendment protections "tumbling down all at once like the walls of Jericho at Joshua's trumpet-blast." Grant Gilmore, *The Ages of American Law* 68 (1977). But it brings to bear violations of individual privacy against government intrusion from which, in my view, the Framers sought—indeed, fought—to protect us. I would reverse the trial court's ruling denying the motion to suppress and remand the case for a new trial.

Oxley, J., joins this dissent except as to part I.B.